UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ESTATE OF NICHOLAS D. RICE, ) | |
| DECEASED, BY: RICK D. RICE AND ) | |
| DIANE J. WALDROP CO-PERSONAL ) | |
| REPRESENTATIVES, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| vs. ) | CAUSE NO. 3:06-CV-697 RM |
| ) | |
| CORRECTIONAL MEDICAL SERVICES, ) | |
| a Missouri Corporation, *et al.* ) | |
| ) | |
| Defendants. ) | |

OPINION AND ORDER

This cause is before the court on the motion of defendants Goshen General

Hospital and A. P. Mathew, MD for summary judgment as to the plaintiff's claims

that Dr. Mathew deprived Nicholas Rice of his constitutional rights while acting

under "color of law" in violation of 42 U.S.C. § 1983[1] and the plaintiff's state law

claims alleging that Goshen Hospital and Dr. Mathew negligently failed to provide

adequate medical care and treatment to Nicholas Rice. The action, brought by Mr.

Rice's Estate, arises from Mr. Rice's death while detained at the Elkhart County

Jail where he battled schizophrenia and various complications as a result of his

refusal to take medication and self-imposed starvation. About ten weeks before his

death, Mr. Rice was admitted to Goshen Hospital because of his deteriorating

mental and physical condition; Dr. Mathew was his attending physician at Goshen

---

[1]After the parties submitted briefs on the plaintiff's motion for summary judgment, the
plaintiff dismissed counts I and II against Goshen Hospital.

Hospital. Dr. Mathew seeks summary judgment on counts I and II of the Estate's complaint, contending that she isn't a state actor and wasn't deliberately indifferent to Mr. Rice's serious medical needs. Dr. Mathew and Goshen Hospital also seek summary judgment on count III, contending that the Estate hasn't satisfied the statutory condition precedent to the filing of a medical malpractice claim under Indiana law.

For the following reasons, the court grants the defendants' motion for summary judgment.

## I. FACTS

The following facts are taken from the summary judgment record and are viewed in the light most favorable to the plaintiff.

*Elkhart County Jail's Relationship with Goshen General Hospital*

Goshen Hospital is a private, not-for-profit hospital located in Elkhart County, Indiana. Goshen Health System, Inc. is the not-for-profit corporate parent of Goshen Hospital Association, Inc., d/b/a Goshen General Hospital. During the relevant time period, Goshen Health System, Inc. employed Dr. Mathew in its Prime Care Physician Network division. She is board-certified in internal medicine and as part of her employment, she provided on-call coverage for patients presenting themselves to the emergency room who needed a physician for admittance to the hospital.

During 2003 and 2004, Goshen Health System had no direct contractual relationship with Elkhart County, with the Elkhart County Sheriff's Department, or with any governmental entity obligating it to provide medical care for inmates or detainees of the Elkhart County Jail. Dr. Mathew wasn't employed by and had no contract for services with Elkhart County or any other government entity in October 2004.

Elkhart County Sheriff Michael E. Books was responsible for the care of the inmates. Sheriff Books renewed the contract between the sheriff's department and Correctional Medical Services (CMS) — the Inmate Medical Service Agreement — under which CMS provided comprehensive health care services to jail inmates. To help meet its contractual obligations, CMS entered into a Provider Agreement with Indiana Lakes Managed Care Organization, LLC (identified in the agreement as "Provider") to provide covered services to correctional facility patients on the terms and conditions set forth in that agreement. In an attachment to the agreement, Goshen Hospital is named as the provider.[2] Another document describing CMS's policy and procedure for hospital and specialty care states that "Goshen General Hospital is the facility used for emergencies with Elkhart General Hospital available as needed. All physicians within both of these two healthcare systems accept inmates. . . ." Neither Goshen Hospital nor Dr. Mathew is a signatory to

---

[2] Mr. Rice's Estate also contends that the agreement states "the provider is a network of Goshen General Hospital, physicians, etc., and that provider will provide medical services to the correctional facility inmates." The court has reviewed the Provider Agreement attached as Exhibit "C", but can't find any such language. The court notes though that page ten of the document is missing and the defendants haven't disputed what the Estate says.

these documents. Defendant Sharrone Jones, RN, a CMS employee working at the Elkhart County Jail during the relevant period, explained in her deposition that Mr. Rice was sent to Goshen Hospital because of the County's contract with the hospital.

*Events Leading to Mr. Rice's Death*

Mr. Rice had an extensive history of mental illness. In high school, he began mental health treatment through various medical providers and eventually obtained a diagnosis of schizophrenia, undifferentiated type. Mr. Rice received counseling and was put on medication for this diagnosis. Mr. Rice was detained in the Berrien County Jail after being arrested for unlawful driving away from an attempted bank robbery; while there, he developed significant mental and physical health issues, requiring hospitalization. He was referred to the University of Michigan Center for Forensic Psychiatry for a determination of competency to stand trial and was finally transferred to Kalamazoo Psychiatric Hospital where he stayed for more than a month. On September 8, 2003, Mr. Rice was transferred to Elkhart County Jail as a pretrial detainee for attempted bank robbery; he was 21 years old. While he was in the custody of Elkhart County Jail, Mr. Rice's mental and physical condition progressively worsened until he died on December 18, 2004.

Bryce Rohrer, M.D., an Oaklawn Psychiatric Center employee, provided medical services to the Elkhart County Jail inmates. Dr. Rohrer saw Mr. Rice once or twice a month, sometimes weekly. Just over a month after his arrival at Elkhart

County Jail, Mr. Rice began refusing his medication and food, became non-communicative and started exhibiting bizarre behavior such as walking around his cell naked. Throughout the rest of 2003 and the beginning of 2004, Mr. Rice began losing a significant amount of weight because of his refusal to take his medication and eat. Dr. Rohrer filed emergency petitions for Mr. Rice's commitment in October 2003 and May 2004; Mr. Rice was temporarily committed to Oaklawn both times, but each time was discharged after less than twenty-four hours. During his visits to Oaklawn in October 2003 and May 2004, Salvador Ceniceros M.D., board certified in psychiatry and neurology, saw Mr. Rice.

Mr. Rice was taken to Goshen Hospital on August 2, 2004 after he slashed his wrist in a suicide attempt. By October 2004, after thirteen months of his confinement at Elkhart County Jail, Mr. Rice had lost fifty pounds. Dr. Rohrer noted on October 5, 2004 that Mr. Rice's weight had dropped to 132 pounds, that he had sustained tremendous weight loss, refused to eat, refused medication and was seriously ill. Dr. Rohrer filed yet another emergency petition for commitment with the Elkhart Circuit Court on October 5, 2004, recommending that Mr. Rice be discharged to a medical facility where psychiatry is available. Dr. Rohrer's application explained that Mr. Rice was dying from malnutrition and would die if not restrained immediately. The court signed an emergency order that day instructing the Sheriff's Department to transport Mr. Rice to one of four health care facilities: Oaklawn, Goshen General Hospital, Bowen Center or Center for Behavior Medicine/Elkhart General Hospital for medical and psychiatric

treatment. Dr. Rohrer decided Mr. Rice should go to Goshen Hospital and directed Nurse Jones to see that Mr. Rice was transferred.

Mr. Rice arrived at Goshen Hospital on October 5. While there, he was shackled to the bed and sheriff deputies were present with him. Mr. Rice was seen initially in the emergency department; the assessment record indicates that Mr. Rice was taken there because he wasn't eating or drinking and his acuity level was urgent. Barbara L. Zimmerman M.D., the emergency room physician who first examined Mr. Rice, was aware that he was possibly starving himself and might be having thoughts of suicide. Dr. Zimmerman noted that Mr. Rice had undifferentiated schizophrenia and hadn't been eating or "eating extremely small amounts" for some time. She conducted an initial evaluation of Mr. Rice, finding symptoms of dehydration and suspecting that he had some thoughts of suicide. In her diagnoses she indicated "(1) Undifferentiated schizophrenia[;] (2) Rule out suicidal ideation[; and] (3) Malnutrition and dehydration."

Dr. Mathew, on call that day at General Hospital, was Mr. Rice's attending physician and admitted him to the hospital after Dr. Zimmerman's initial examination. There is evidence that Dr. Mathew spoke with someone from Elkhart County Jail before Mr. Rice arrived, and that she agreed to handle his care. The medical and correctional records generated at the jail were provided to Goshen Hospital and were available to Dr. Mathew. After Dr. Mathew examined Mr. Rice and while he still was at the hospital, she reviewed his chart, which included jail records, certain medical records relating to his stay at Kalamazoo Psychiatric

6

Hospital and Oaklawn, and the application for emergency detention records. Based on her review of the Oaklawn records, Dr. Mathew indicated that Mr. Rice might have been malingering. At some point during Mr. Rice's stay at the hospital, Dr. Mathew also became aware of Mr. Rice's August 2004 visit to Goshen Hospital for attempted suicide. Dr. Mathew further reviewed Dr. Rohrer's 72-hour commitment application and was aware that Mr. Rice had lost fifty pounds in the last year because he wasn't eating. The jail records further indicated that Mr. Rice had been refusing food, refusing to take his medication for some time, walking about the ward naked, and showing other visible signs of a psychotic break.[3]

Mr. Rice underwent a physical work-up at the hospital.[4] Dr. Mathew determined from her examination that Mr. Rice had symptoms of dehydration and moderate malnutrition. Mr. Rice was uncooperative during the hospital stay and refused medications and diet. Dr. Mathew assessed Mr. Rice as having "[a]norexia and malnutrition secondary to schizophrenia versus malingering." Mr. Rice was rehydrated with some fluids and encouraged to eat, but Dr. Mathew didn't administer the psychotropic drugs that he had been prescribed previously.

---

[3] Although the Estate cites to Exhibit K to detail Mr. Rice's medical history available to Dr. Mathew, that exhibit wasn't attached and isn't part of the summary judgment record.

[4] An IV of normal saline was started, laboratory studies and an EKG were done. His blood pressure, temperature, pulse, and respiratory rate all were normal. His HEENT (head, eyes, ears, nose, and throat) also were normal except that his pharynx was dry. The lab studies showed slightly high sodium but normal total protein and albumin, normal renal function, and all of his other electrolytes were within normal limits. The EKG showed a normal sinus rhythm rate of 71. Mr. Rice had a slightly high urine specific gravity greater than 1.03, he appeared cachectic, "quite pale," and emaciated.

After evaluating Mr. Rice and upon his discharge, Dr. Mathew determined that he was hemodynamically stable but needed psychiatric intervention. Before discharging Mr. Rice, Dr. Mathew called Dr. Ceniceros, the psychiatrist on call that day at Oaklawn, to ask what disposition he wanted. Dr. Ceniceros testified at his deposition that he received a call from a physician (presumably Dr. Mathew) informing him of Mr. Rice's behavior, stating that his lab values were all within normal limits and that she "saw no need to admit . . . the patient to Goshen Hospital." (Ceniceros Dep., p. 71). According to Dr. Ceniceros, he asked whether there were any overt psychiatric problems — "overt psychiatric problems" is a medical term used to determine if the patient is a threat to himself or others or if he is unable to care for himself. (Ceniceros Dep., p. 72). Dr. Mathew responded that "all of those were negative"; Dr. Ceniceros replied, "Well, he can go back to the county jail." (Ceniceros Dep., pp. 71-73).[5] Dr. Ceniceros indicated to Dr. Mathew that an Oaklawn psychiatrist could follow Mr. Rice as an outpatient at the jail. Dr. Mathew didn't seek a second opinion or call Dr. Rohrer, whom she knew had been seeing Mr. Rice at the jail. Mr. Rice was discharged after twelve hours of observation by Dr. Mathew.

Dr. Mathew issued a discharge recommendation to the Elkhart County Jail and copied Dr. Rohrer. The recommendation provided in part:

---

[5] Although Dr. Mathew's recount of the conversation is substantially different — her records indicate that Dr. Ceniceros stated: "Oaklawn would not accept him for admission because on previous admission the patient was found to be malingering" — this court must view the evidence in the light most favorable to the plaintiff at the summary judgment stage.

> I discussed this plan with the Elkhart County Jail. We could give him feeding through parenteral measures, however, his protein and electrolytes are all within normal limits and this also would be a very temporary measure. The patient's real problem is probably psychiatric and/or possible malingering and this will need to be addressed. The patient's medical status currently is stable, however, if he continues to not eat, of course, the patient will have a poor prognosis. At this point we can only encourage him to eat and have him obtain the necessary psychiatric care as an out-patient. I did not detect that the patient had suicidal ideation. The patient seemed appropriate at times, however, at other times would grimace and be very uncooperative. At this point I feel that it is probably safe to return him to the county jail. I recommend possibly some high protein Resource shakes if he will take those and he is discharged on his current medications. The patient is to follow up with the medical physician at the Elkhart County Jail in one week. He is also to follow up with the Oaklawn psychiatrist within one week. . . .

Dr. Mathew testified that she believed Dr. Rohrer would continue to assess Mr. Rice's psychiatric condition and implement the necessary measures, but acknowledged that Mr. Rice had been refusing food and medication at the hospital and wasn't doing well either physically or mentally. Dr. Mathew indicated in Mr. Rice's medical records that "[t]he patient apparently is to be medically stabilized and then sent back to Oaklawn for further psychiatric evaluation and management." (Dr. Mathew's Affidavit, Ex. B). But Mr. Rice wasn't sent back to Oaklawn.

Mr. Rice was found dead in his cell about ten weeks after being discharged from Goshen Hospital. There is evidence that Dr. Mathew's discharge recommendations weren't followed after his return to the jail. When county coroner Jeffrey Landrum viewed Mr. Rice's dead body, he wasn't convinced that malnutrition was a factor in his death, especially since Mr. Rice had been

discharged from the hospital weeks earlier as "dynamically stable." After reviewing Mr. Rice's jail records, though, Mr. Landrum "had a better understanding of the long, chronic nature of [Mr. Rice's] medical problems and mental problems, [his] treatment. . . and how his condition changed significantly from the time that he became a resident of the Elkhart County Jail up until the time of his death . . ." (Landrum Dep., p. 57). Upon further investigation and review, Mr. Landrum determined that malnutrition was a contributing factor in Mr. Rice's death. In the coroner's report and death certificate, the cause of death was reported as cardiomegaly (an enlarged heart), undifferentiated schizophrenia and chronic malnutrition with a low salt pattern.

The plaintiff's expert, Robert M. Stark, M.D., determined that at the time of Mr. Rice's death, he was starving and severely malnourished and that "[t]o a reasonable degree of medical certainty, Mr. Rice died of starvation-related heart failure." (Dr. Stark's report, p. 3). Dr. Stark further opined that "Dr. Mathew's conclusion that Mr. Rice was 'hemodynamically stable' was by no means a medical justification to return him to jail."[6] (Dr. Stark's report, p. 4).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits,

---

[6]The defendants moved to strike Dr. Stark's declaration; as discussed later, the court denies the motion.

if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact couldn't find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Crull v. Sunderman, 384 F.3d 453, 459-460 (7th Cir. 2004). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004); Rand v. CF Indust., Inc., 42 F.3d 1139, 1146 (7th Cir. 1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors . . .").

The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in her favor. Lawrence v. Kenosha County, 391 F.3d 837, 842 (7th Cir. 2004); see also Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) ("As we have said before, summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" (quoting Schacht v. Wisconsin Dep't of Corr., 175 F.3d 497, 504 (7th Cir. 1999)); Anderson v. Liberty Lobby, 477 U.S. at 252 ("The mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

## III. DISCUSSION

To establish a claim under 42 U.S.C. § 1983, a plaintiff must establish that the defendant: (1) was acting under color of state law; and (2) deprived the plaintiff of a right or an interest secured by the Constitution or laws of the United States. See Jones v. Wilhelm, 425 F.3d 455, 465 (7th Cir. 2005). Conduct that satisfies the state action requirement of the Fourteenth Amendment also satisfies the under color of state law requirement of § 1983. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 935, 102 S. Ct. 2744, 2749-2750 (1982). The Fourteenth Amendment's Due Process Clause protects pretrial detainees under the same standards as the Eighth Amendment. Zentmyer v. Kendall County, Ill., 220 F.3d 805, 810 (7th Cir. 2000).

### State Actor

Before a private party's conduct can be deemed to be state action, there generally must be a sufficiently close association between the state and the private conduct so that the action "may be fairly treated as that of the State itself." Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)). The essential question is whether the nominally private conduct is properly attributable to the

state. Brentwood Acad. v. Tenn. Secondary Sch., 531 U.S. at 295. This is a fact-intensive inquiry that "is a matter of normative judgment, and the criteria lack rigid simplicity." Brentwood Acad. v. Tenn. Secondary Sch., 531 U.S. at 295-296. The Supreme Court has set forth a number of tests for deciding whether a private actor has engaged in state action for § 1983 purposes, of which two are relevant to this case: the "nexus" test, in which the actions of a private party bear a sufficiently close "nexus" to the state, Jackson v. Metro. Edison Co., 419 U.S. at 351, and the "public function" test, in which private actors perform functions traditionally reserved exclusively to the state, Jackson v. Metro. Edison, 419 U.S. at 352; see also Wade v. Byles, 83 F.3d 902, 905 (7th Cir. 1996). As explained in West v. Atkins, 487 U.S. 42, 56, 108 S.Ct. 2250, 2259 (1988), "the dispositive issue concerns the relationship among the State, the physician, and the prisoner." Id. (finding that a private physician who contracted with the prison system to provide medical services at a state-prison on a part-time basis acted under color of state law for purposes of § 1983 when treating an inmate's injury).

The parties disagree about whether a physician is a state actor when treating an inmate at a private hospital that has no direct contract to treat inmates regularly. Courts disagree, too. See, e.g., Styles v. McGinnis, 28 Fed. Appx. 362 (6th Cir. 2001) (unpublished) (emergency room physician not state actor because no contract with state; independent contractor); Griffis v. Medford, 2007 WL 2752373, *6 (W.D. Ark. 2007) (psychiatrists treating an inmate at a private mental health center didn't act under color of state law for purposes of §

13

1983 where the defendants had no contractual relationship with the state, no state doctor referred the inmate to the center, there was no proof of an ongoing relationship between the defendants and the jail, and the treatment rendered to the inmate began before his incarceration); Sykes v. McPhillips, 412 F. Supp. 2d 197, 199 (N.D. N.Y. 2006) (emergency room physician with no contract with state not state actor); Williams v. Brann, 2006 WL 1518979, *4 (E.D. Wis. 2006) (where there was no evidence in the record to suggest that the physician performed services pursuant to a contract with the state, he couldn't be considered a state actor under the "public function" test); see also Neal v. Anspaugh-Kisner, 2008 WL 506336, *10 (E.D. Mich. 2008) (an independent physician who treated an inmate at a private hospital wasn't a state actor, distinguishing West v. Atkins, 487 U.S. at 56 because there was no showing of a direct relationship between the doctor and the prison, the doctor performed his medical duties in a physician-controlled environment and the prison had no influence or control over his treatment); Wendt v. Hutchinson, 2008 WL 4280117, *2 (E.D. Mich. 2008) (dismissing prisoner complaint for similar reasons); McIlwain v. Prince William Hosp., 774 F. Supp. 986, 989-990 (E.D. Va. 1991) (a private hospital that provided emergency medical care to a prison inmate didn't act under color of state law where the hospital had no contract with the prison to treat its inmates and didn't treat inmates routinely); Martinson v. Bruce, 1991 WL 241857, *2 (D. Kan. 1991) (a private orthopaedic physician who saw inmate for one visit at a private clinic not located on prison property didn't act under color of state law where the physician

had no contractual relationship with the state to provide medical care to inmates); Callahan v. Southwestern Medical Center, 2005 WL 1238770, *4 (W.D. Okla. 2005)(a private hospital that didn't have a direct contract with the department of corrections for treatment of inmates wasn't a state actor when prisoner was brought to hospital for emergency care); Gallegos v. Slidell Police Dept., 2008 WL 5381511, *3 (E.D. La. 2008) (finding no state action when "Plaintiff does not allege that the medical defendants treated him pursuant to a contract with a government entity, and he apparently was not treated at a police station or jail but at a hospital"). *Contra*, Conner v. Donnelly, 42 F.3d 220, 225 (4th Cir. 1994) ("Regardless of the physician's employment relationship with the state, any physician authorized by the state to provide medical care to a prisoner exercises power that is traditionally the exclusive prerogative of the state."); Anglin v. City of Aspen, Colo., 552 F. Supp. 2d 1229, 1243-1244 (D. Colo. 2008) (finding state action where the plaintiff was treated in the institutional setting but noting that nothing in West suggests that a physician must have a direct contractual relationship with the state in order to establish state action); see also Lewellen v. Schneck Medical Center, 2007 WL 2363384, *9-10 (S.D. Ind.) (finding a question of fact as to whether a physician employed by private entity that voluntarily contracted with a county hospital to provide general medical services was a state actor, relying on Conner).

Our court of appeals hasn't yet spoken, *cf.* Spencer v. Lee, 864 F.2d 1376, 1381-1382 (7th Cir. 1989) (private physician and a private hospital don't act under

color of state law when committing mentally disturbed person pursuant to emergency court order); Ridlen v. Four County Counseling Center, 809 F. Supp. 1343, 1355 (N.D. Ind. 1992) (finding that the commitment of a person to a private hospital under the directive of a court order doesn't extend the color of law to actions of private physicians and private hospitals), but the issue pends before that court in Rodriguez v. Plymouth Ambulance Service *et al.*, No. 06-4260.

Resolution of the issue is unnecessary to decide today's summary judgment motion.

*Motion to Strike Portions of Dr. Stark's Report*

The defendants ask the court to strike Dr. Stark's report because it was filed after the Estate's response. Along with its response, the Estate filed a motion for additional time to file an expert medical affidavit in opposition to defendants' summary judgment motion. The Estate indicated that Dr. Stark was preparing his opinion and anticipated that Dr. Stark would provide his affidavit within six days. The Estate filed Dr. Stark's affidavit and attached report within that time frame. Because the Estate sought an extension of time to file the affidavit and then filed it within a reasonable time, the court denies the defendants' motion to strike the entire report. See Maldonado v. U.S. Bank, 186 F.3d 759, 769 (7th Cir. 1999) (noting that the district court has "great discretion" in determining the proper application of Rule 56(e)).

The defendants further move to strike some statements in the report based upon lack of foundation and personal knowledge pursuant to Federal Rule of Evidence 602. The defendants also allege that some statements contain impermissible legal conclusions as to whether there was deliberate indifference to a serious medical need. The defendants contend that the following statements should be stricken:

(a)    "Dr. Mathew was fully aware that Mr. Rice had been refusing both food and drink, and medications. Dr. Mathew had no reason to believe that this same pattern would not subsequently continue back in the Elkhart County Jail."

(b)    "She [Dr. Mathew] knew that he was suicidal, starving and dehydrated. She knew the likely consequence of returning him to the jail without further treatment."

(c)    "With knowledge of Mr. Rice's medical history, confinement behavior and his physical and mental findings of October 5th and 6th, Dr. Mathew showed indifference to Mr. Rice's serious medical condition by turning a blind eye to the likely outcome of a return to jail."

The admissibility of the first two quotations turns on interpretation. As an expert witness, Dr. Stark need not have personal knowledge of the underlying facts in the lawsuit and may testify to his specialized knowledge to assist the trier of fact. See Fed. R. Evid. 602, 702, 703; see also Estate of Cole v. Fromm, 941 F. Supp. 776, 780-781 (S.D. Ind. 1995). But Dr. Stark is no expert in Dr. Mathew's cognition, and can't testify to what she realized or didn't realize. Having reviewed the record, he can opine as to what she should have known and what she had reason to believe by the time she made her decisions. Such opinions fall

comfortably within the expertise of a medical witness. The court interprets the statements in that light.

Admissibility of the third quotation also turns on interpretation. As discussed later, to establish deliberate indifference, the Estate must show that Dr. Mathew knew Mr. Rice's medical condition was serious and yet turned a blind eye to his need for treatment. See Johnson v. Snyder, 444 F.3d 579, 583 (7th Cir. 2006); Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir.1988). As such, an opinion that Dr. Mathew turned "a blind eye to the likely outcome of a return to jail" could be construed as a legal conclusion as to Dr. Mathew's subjective knowledge. If so construed, it is inadmissible. See Sommerfield v. City of Chicago, 2008 WL 4786509, *19 (N.D. Ill. 2008) (citing Haley v. Gross, 86 F.3d 630, 645 (7th Cir. 1996) ("[Expert] was not allowed to testify regarding the dictates of deliberate indifference law . . ."); Salas v. Carpenter, 980 F.2d 299, 305 (5th Cir.1992) (excluding expert testimony about defendant's alleged deliberate indifference in the context of a motion for summary judgment). Although Federal Rule of Evidence 704(a) provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact", such opinion evidence must still be helpful to the trier of fact. "Objective facts and circumstances may provide evidence of a defendant's state of mind, but conclusory statements that a defendant acted with deliberate indifference do not assist the trier of fact." Woodhull v. County of Kent, 2006 WL 2228986, *6 (W.D. Mich. 2006); see, e.g.,

<u>Good Shepherd Manor Foundation, Inc. v. City of Momence</u>, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"); <u>Isom v. Howmedica, Inc.</u>, 2002 WL 1052030, 2 (N.D. Ill. 2002) (excluding expert's opinions that the defendant "conscious disregarded" and was "grossly indifferent" to the risk of injury). In this context, the statement in quote (c) that Dr. Mathew showed indifference by turning a blind eye to Mr. Rice's condition is therefore inadmissible.

On the other hand, if the statement is understood as Dr. Stark simply trying to use English, rather than legal terms, to express his opinion on Dr. Mathew's conduct, it ceases to be an opinion on the law. <u>See</u>, <u>e.g.</u>, <u>Torres v. County of Oakland</u>, 758 F.2d 147, 151 (6th Cir. 1985). If Dr. Stark were to offer his opinion in such terms at trial, the court likely would sustain an objection and direct that it be rephrased, lest the jury think it was hearing an opinion on the law. <u>See</u>, <u>e.g.</u>, <u>Thurman v. Missouri Gas Energy</u>, 107 F. Supp. 2d 1046, 1055 (W.D. Mo. 2000). But the court would allow Dr. Stark to rephrase his opinion to say Dr. Mathew should not have afforded so little weight to what was likely if Mr. Rice were returned to jail. Again, the court will interpret the statement in such a way that it is admissible.

Because the court can, and will limit its consideration of the challenged statements to admissible uses, the court denies the motion to strike.

*Deliberate Indifference*

The Eighth Amendment prohibits cruel and unusual punishment. As incorporated through the Fourteenth Amendment, this prohibition imposes a duty on states "to provide adequate medical care to incarcerated individuals."[7] Johnson v. Doughty, 433 F.3d 1001, 1010 (7th Cir. 2006) (quoting Boyce v. Moore, 314 F.3d 884, 888-889 (7th Cir. 2002)). State actors fail in this duty if "they display deliberate indifference to serious medical needs of prisoners." Johnson v. Doughty, 433 F.3d at 1010 (internal quotations and citations omitted); see also Johnson v. Snyder, 444 F.3d at 584. A claim that Dr. Mathew violated the Eighth Amendment consists of two elements: (1) an objectively serious medical condition, and (2) deliberate indifference to that condition. Zentmyer v. Kendall County, Ill., 220 F.3d at 810.

An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005) (citing Foelker v. Outagamie County, 394 F.3d 510, 512-13 (7th Cir. 2005)). A serious medical condition needn't be "life-threatening." Johnson v. Snyder, 444 F.3d at 585.

The Estate has presented evidence to satisfy the objective part of the test; a jury could conclude that Mr. Rice had a serious medical need. Mr. Rice went to

---

[7]"The protections for pre-trial detainees are at least as great as the Eighth Amendment protections available to a convicted prisoner, and [courts] frequently consider the standards to be analogous." Washington v. LaPorte County Sheriff's Dept., 306 F.3d 515, 517 (7th Cir. 2002) (internal citations and quotations omitted). "[T]here is little practical difference between the two standards." Weiss v. Cooley, 230 F.3d 1027, 1032 (7th Cir. 2000).

the hospital because he wasn't taking his medications, wasn't eating, had lost fifty pounds in thirteen months and was uncommunicative. Medical records indicated that he had severe mental problems that posed a risk of serious damage to his future health. Dr. Mathew acknowledged the seriousness of Mr. Rice's condition in her medical recommendation when she stated: "The patient's medical status currently is stable, however, if he continues to not eat, of course, the patient will have a poor prognosis." Ten weeks after his hospital stay, Mr. Rice died from malnutrition and Dr. Stark opined that Mr. Rice was starving at the time of his death. The defendants don't appear to dispute that Mr. Rice had a serious medical condition.

The parties dispute whether Dr. Mathew was deliberately indifferent to this serious medical need. Deliberate indifference is a subjective standard. Johnson v. Snyder, 444 F.3d at 585. To demonstrate deliberate indifference, the Estate must show that Dr. Mathew "acted with a sufficiently culpable state of mind." Johnson v. Snyder, 444 F.3d at 585 (quoting Johnson v. Doughty, 433 F.3d at 1010). Deliberate indifference "is more than negligence and approaches intentional wrongdoing." Collignon v. Milwaukee County, 163 F.3d 982, 988 (7th Cir. 1998) (citing Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970 (1994)).

A prisoner "need not prove that the prison officials intended, hoped for, or desired the harm that transpired." Walker v. Benjamin, 293 F.3d 1030, 1037 (7th Cir. 2002) (citing Haley v. Gross, 86 F.3d at 641); see also Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008) ("[A]lthough deliberate indifference means more

than negligen[ce], it is something less than purposeful."). The standard requires that the state actor have "subjective awareness" of the serious medical need and then act or fail to act with indifference to that need. See Riccardo v. Rausch, 375 F.3d 521, 526 (7th Cir. 2004) (citation omitted); see also Walker v. Benjamin, 293 F.3d at 1037 ("It is enough to show that the defendants actually knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk."). A trier of fact can conclude that the defendant was aware of the risk if the danger was objectively so great that actual knowledge of the danger could be inferred. Walker v. Benjamin, 293 F.3d at 1037 (citing Farmer v. Brennan, 511 U.S. at 842). The Eighth Amendment protects a detainee not only from deliberate indifference to his current serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to future health. Board v. Farnham, 394 F.3d 469, 479 (7th Cir. 2005) (citing Henderson v. Sheahan, 196 F.3d, 839, 846-847 (7th Cir. 1999)).

"Deliberate indifference is not medical malpractice; the Eighth Amendment doesn't codify common law torts." See Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008) (citing Sherrod v. Lingle, 223 F.3d 605, 610 (7th Cir. 2000)); see also Majors v. Ridley-Turner, 277 F. Supp. 2d 916, 919 (N.D. Ind. 2003) ("Even medical malpractice and incompetence do not state a claim of deliberate indifference."). Disagreement with medical personnel over what constitutes appropriate treatment is insufficient to establish deliberate indifference. Reed v. Indiana Dept. of Corrections, 30 Fed. Appx. 616, 618 (7th Cir. 2002) (citing Estelle

v. Gamble, 429 U.S. 97, 107 (1976)). "A jury can 'infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" See Duckworth v. Ahmad, 532 F.3d at 679 (citing Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006)); see also Collignon v. Milwaukee Co., 163 F.3d at 989 ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances.").

Mr. Rice underwent a physical work-up while at Goshen Hospital. He had an IV of normal saline started, laboratory studies performed and an EKG, showing a normal sinus rhythm rate of 71. Mr. Rice's electrolytes were within normal limits, except that he showed a slightly high sodium level. Dr. Mathew noted that Mr. Rice's pharynx was dry, he appeared cachectic, "quite pale," emaciated, and had exhibited symptoms of dehydration and moderate malnutrition. Dr. Mathew assessed the patient as having "[a]norexia and malnutrition secondary to schizophrenia versus malingering." She acknowledged that Mr. Rice's continued refusal to eat would result in a poor prognosis, suggesting that she understood the serious risk potentially facing Mr. Rice. The question, then, is whether Dr. Mathew's treatment was so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment. See

Duckworth v. Ahmad, 532 F.3d at 679; see also Reed v. McBride, 178 F.3d 849, 854 (7th Cir. 1999) (where the prison official knows of the serious harm, the court then must consider the "response element" of the subjective test).

Mr. Rice was rehydrated with some fluids (the parties dispute whether he received sufficient fluids) and encouraged to eat. Upon his discharge, Dr. Mathew determined that while Mr. Rice was medically stable, he needed psychiatric intervention. She issued a discharge recommendation to the Elkhart County Jail (copying Dr. Rohrer), informing the jail that Mr. Rice's real problem is "probably psychiatric and/or possible malingering" and stating that this would need to be addressed. Dr. Mathew is an internal medicine doctor who doesn't practice in psychiatry. She recommended that Mr. Rice follow-up with the jail medical physician and with an Oaklawn psychiatrist within a week. She also recommended high protein shakes, but could be found to have realized that Mr. Rice might refuse them. It is undisputed that Dr. Mathew called Dr. Ceniceros to ask what disposition he wanted. Although the substance of that conversation is disputed, Dr. Ceniceros indicated to Dr. Mathew that Mr. Rice could be followed as an outpatient at the jail by an Oaklawn psychiatrist. Dr. Mathew testified that she believed Dr. Rohrer would continue to assess Mr. Rice's psychiatric condition and implement the necessary measures.

Maybe Dr. Mathew should have done more to treat Mr. Rice and ensure his medical well-being, but that's not the question for purposes of liability under § 1983. Dr. Mathew acknowledged that Mr. Rice wasn't doing well physically or

mentally within the jail and had been refusing to eat and take his medications. Dr. Stark opined that Dr. Mathew should "have gone up the established medical chain of command to secure another psychiatrist or facility that would accept his care," instead of sending him back to the jail where he wouldn't receive proper treatment. Dr. Mathew might have kept Mr. Rice in the hospital longer for further evaluation and treatment (she discharged him after only twelve hours of observation under a 72-hour commitment order), force fed him, continued giving him fluids and other nutrients, administered his medications through injections, or requested that Oaklawn admit him for further evaluation. After her conversation with Dr. Ceniceros, Dr. Mathew didn't ask for a second opinion or ask to speak with Dr. Rohrer. Mr. Rice's condition was serious and the evidence suggests he needed further treatment, but Dr. Mathew never confirmed or followed-up with Dr. Rohrer on Mr. Rice's continued treatment.

Still, the evidence in the summary judgment record would not allow a finding that her chosen treatment was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." See Duckworth v. Ahmad, 532 F.3d at 680. Dr. Mathew evaluated Mr. Rice, performed tests and assessed his condition, and determined that he was medically stable and recommended further outpatient psychiatric care. That the jail personnel didn't follow Dr. Mathew's discharge recommendations doesn't support an inference that she knew (even if she should have known) her recommendations would go unheeded. Dr. Mathew acknowledged the risk Mr. Rice

faced and recognized that he needed psychiatric care; she referred (at least informally) Mr. Rice's future care to the jail and Dr. Rohrer. <u>Johnson v. Doughty</u>, 433 F.3d at 1014 (finding that Dr. Hinderliter wasn't deliberately indifferent where he only saw the patient once, concluded that surgery wasn't required, prescribed non-surgical means aimed at alleviating the patient's pain, and referred further discussion of surgery to another doctor). No rational jury could find, based on the evidence in the summary judgment record, that Dr. Mathew disregarded or turned a blind eye to Mr. Rice's medical needs.

Dr. Stark's report might shed light on how a reasonable doctor would have treated Mr. Rice (or Dr. Stark might be wrong), but this doesn't shed light on Dr. Mathew's state of mind. Medical malpractice, negligence and even gross negligence don't equate to deliberate indifference. <u>See</u> <u>Johnson v. Doughty</u>, 433 F.3d at 1012-1013. Nor did Dr. Mathew's chosen course of treatment so depart from accepted professional practice to allow the jury to infer indifference. Because there is no evidence upon which a reasonable trier of fact could find that Dr. Mathew's treatment decisions were anything but her professional medical judgment, the Estate's § 1983 claims against Dr. Mathew cannot succeed.

*Count III - State Law Claims*

As the Estate notes, Goshen Hospital and Dr. Mathew are qualified health care providers and so are subject to Indiana's medical review panel process. The Estate has filed a proposed complaint before the Indiana Commissioner of

Insurance, but the panel hasn't yet rendered an opinion. The Estate asks this court to retain jurisdiction over its state law claims, which arise out of the nucleus of operative facts common to its federal claims.

INDIANA CODE § 34-18-8-4 provides that "[n]otwithstanding section 1 of this chapter, and except as provided in sections 5 and 6 of this chapter, an action against a health care provider may not be commenced in a court in Indiana before: (1) the claimant's proposed complaint has been presented to a medical review panel . . . and (2) an opinion is given by the panel." See also H.D. v. BHC Meadows Hosp., Inc., 884 N.E.2d 849, 853 (Ind. Ct. App. 2008). "[T]he Act grants subject matter jurisdiction over medical malpractice actions first to the medical review panel, and then to the trial court." H.D. v. BHC Meadows, 884 N.E.2d at 853.

Section 7 of the Act allows a claimant to commence a malpractice action at the same time as the claimant's proposed complaint, but to comply with this section the complaint can't contain any information that would allow a third party to identify the defendant; the claimant is prohibited from pursuing the action; and the court is prohibited from taking any action except setting a date for trial. IND. CODE § 34-18-8-7.

The Indiana General Assembly doesn't decide the jurisdiction of the federal courts, so the legislative prohibition on court action doesn't affect this court's subject-matter jurisdiction. Tackett v. General Motors Corp., 93 F.3d 332, 334 (7th Cir. 1996). But because the review panel hasn't issued an order and the plaintiff didn't file suit pursuant to section 7, the Estate's complaint states no

claim upon which relief can be granted under Indiana law as to Dr. Mathew or Goshen Hospital at this point. See Lyons v. Lutheran Hosp. of Ind., 2004 WL 2272203, *2 (S.D. Ind. 2004) (unreported) (citing Castelli v. Steele, 700 F. Supp. 449, 455 (S.D. Ind.1988)). The court therefore dismisses count III as to Dr. Mathew and Goshen Hospital without prejudice.

## IV. CONCLUSION

Based on the reasons cited above, Goshen Hospital and Dr. Mathew's summary judgment motion (document # 135) is GRANTED IN PART. Summary judgment is granted to the moving defendants on counts I and II of the complaint, and count III is dismissed without prejudice. The court denies the Estate's motion for oral argument [document # 145].

SO ORDERED.

ENTERED:  January 26, 2009

_____/s/ Robert L. Miller, Jr._____
Chief Judge United States District Court