UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ESTATE OF NICHOLAS D. RICE,      )
DECEASED, BY: RICK D. RICE AND   )
DIANE J. WALDROP CO-PERSONAL     )
REPRESENTATIVES,                 )
                                 )
                    Plaintiff    )
                                 )
         vs.                     )      CAUSE NO. 3:06-CV-697 RM
                                 )
CORRECTIONAL MEDICAL SERVICES,   )
a Missouri Corporation, *et al.* )
                                 )
                    Defendants   )

## OPINION AND ORDER

This case brought by the Estate of Nicholas Rice arises from Mr. Rice's death while detained at the Elkhart County Jail where he battled schizophrenia and various complications from his mental condition. Pending are the motions of Correctional Medical Services defendants (CMS, Rebecca Hess, Sharrone Jones, Cindy Lambright, Joy Bell, Florence Makousky, and Margaret Miller), Elkhart County defendants (Sheriff Michael Books, Captain Brad Rogers, Lieutenant Fred Call, Officer Jennifer Shelton, Officer Scott Eisenhour, Officer Kimberly Baxter, and Officer Samantha Werth), and Oaklawn Psychiatric Center, Inc. defendants (Oaklawn, Bryce Rohrer, M.D., and Salvador Ceniceros, M.D.) for summary judgment as to the plaintiff's federal claims alleging deprivation of Mr. Rice's constitutional rights while in the custody of Elkhart County Jail.

For the following reasons, the court GRANTS the defendants' motions for summary judgment and dismisses the Estate's remaining state law claims without prejudice.

I. FACTS

The following facts are taken from the summary judgment record and are viewed in the light most favorable to the plaintiff.

A. *The Parties*

Mr. Rice had a history of mental illness. In high school, he was diagnosed with schizophrenia undifferentiated type. At age 21, he was arrested for attempted bank robbery and detained in the Berrien County Jail; he developed significant mental and physical health issues while there, requiring hospitalization. After his arrest, but before his transfer to Elkhart County Jail, Mr. Rice was hospitalized for his mental and physical health issues at Lakeland Regional Center and then underwent outpatient treatment before being committed to the Kalamazoo Psychiatric Hospital for two months. On September 8, 2003, he was detained at the Elkhart County Jail.

Michael Books was the Sheriff of Elkhart County and the keeper of its jail. Defendant Capt. Rogers, commander of the jail, worked with Lt. Fred Call, the jail warden, and other corrections/jail officers in the daily management of inmates at the jail, including the monitoring of Mr. Rice. Sheriff Books had entered into an

ongoing contract with Correctional Medical Services to provide comprehensive health care services to the jail inmates. CMS employee Sharrone Jones, RN, was the charge nurse at the Elkhart County Jail, and she and other CMS staff were responsible for tending to the inmates' medical needs. CMS employee Rebecca Hess, RN, supervised the nurses at Elkhart County Jail and other facilities and was at the jail two or three times a week. CMS contracted with Oaklawn Psychiatric Center to provide psychiatric-mental health services to the inmates. The contract between CMS and Oaklawn reserved mental health treatment decisions to Oaklawn and its physician, Dr. Bryce Rohrer.

Dr. Rohrer provided mental health treatment at the jail during Mr. Rice's detainment. Dr. Rohrer is board certified in family medicine. He has practiced family psychiatry for numerous years and had been performing these services for the jail for the previous decade. Dr. Rohrer met with Mr. Rice at the jail and generally saw him once or twice a month. On two occasions, when Dr. Rohrer thought that Mr. Rice needed greater care, he obtained a court order for Mr. Rice's transfer to Oaklawn. Dr. Salvador Ceniceros, who is board certified in psychiatry and neurology, provided mental health treatment to Mr. Rice while he was at Oaklawn. On another occasion, Dr. Ceniceros evaluated Mr. Rice to determine if he was competent to stand trial. Dr. Ceniceros didn't treat patients in the jail or provide any services within the jail.

*B. Mr. Rice's Detainment at Elkhart County Jail*

When Mr. Rice arrived at the jail in September 2003, Florence Makousky, LPN, completed his intake screening in which she noted that he suffered from chronic mental illness. CMS had access to Mr. Rice's medical history and knew of his psychiatric history and prescription for psychotropic medication. On September 10, 2003, Dr. Rohrer first met with Mr. Rice and became aware that he had been taking Seroquel (psychotropic medication), had a history of not eating, and had been diagnosed with schizophrenia. At that initial meeting, Dr. Rohrer wrote Mr. Rice another prescription for Seroquel. Later that month, CMS employee Margaret Miller, a social worker, observed that Mr. Rice showed "clear visible signs of psychotic break" and recommended that Dr. Rohrer examine him "ASAP." On October 1, 2003, Dr. Rohrer noted that Mr. Rice was suddenly non-communicative and refusing medication. He directed CMS staff to track and log whether Mr. Rice was eating. A week later, Dr. Rohrer noted that Mr. Rice was refusing to take his prescribed psychotropic medication.

On October 28, 2003, Mr. Rohrer petitioned the state court to involuntarily commit Mr. Rice to a mental facility for seventy-two hours, stating that Mr. Rice was "refusing psychotropic mediation and refusing to eat, refusing to communicate most of time, diagnosed as schizophrenia." The court granted the petition and Mr. Rice was admitted temporarily to Oaklawn, where he was treated by Dr. Ceniceros and received an intramuscular shot of psychotropic medication. Dr. Ceniceros testified that during Mr. Rice's commitment, he exhibited no signs

of psychosis, interacted with others appropriately, was eating and drinking, and accepted medication. Given Mr. Rice's behavior, Dr. Ceniceros determined that there was no medical need for him to be committed to Oaklawn or to justify administration of forced medication. Mr. Rice was sent back to the jail after less than twenty-fours hours at Oaklawn. Dr. Ceniceros saw Mr. Rice again in December 2003 as part of a criminal competency exam and determined that Mr. Rice was competent to stand trial.

Dr. Rohrer continued to assess Mr. Rice from November 2003 to January 2004, reporting that he refused to talk, refused to take medication, and his psychotic disorder had worsened. On November 18, 2003, Dr. Rohrer ordered the nurses to give Mr. Rice an intramuscular Haldol shot every four weeks as long as he didn't refuse the medication. Mr. Rice was only administered the shot on December 2. Two weeks later, Mr. Rice saw Dr. Rohrer and asked to go back on Seroquel, so Dr. Rohrer prescribed the medicine. On January 13, 2004, Dr. Rohrer noted that Mr. Rice was non-communicative and sometimes wouldn't take his medication. Dr. Rohrer increased Mr. Rice's Seroquel and ordered that if he refused to take it, he should be placed back on Haldol.

Cindy Lambright, LPN, noted in February 2004 that Mr. Rice wouldn't take medications or wear clothes. In April 2004, Captain Rogers requested Nurse Hess to prepare a memorandum summarizing Mr. Rice's condition. Her memorandum, sent to Capt. Rogers and Lt. Call on April 14, 2004, stated that Mr. Rice continued to refuse mediation and refused food at times and further noted that there was no

significant changes in his weight. In an April 30, 2004 entry, Nurse Lambright noted that "[d]uring shake down refused to come out of cell[,] officers extracted. Unable to stand, right foot drop, coccyx has large 3 inch area of darkened skin, entire body jaundice. When officers picked [patient] up skin (dead cells) sloughed off in great numbers[,] refused to talk. Officers state Lt. Call investigating forced bathing[-] alternate health."

Dr. Rohrer didn't physically see Mr. Rice from February 10, 2004 until May 11, 2004. On May 11, he reported that Mr. Rice was "refusing med and refusing to see me. Not practicing self care and only eats junk food. Refuses regular meals. Doesn't speak or respond." Dr. Rohrer also noted that it looked like Mr. Rice was developing bedsores. He again petitioned the court for a 72-hour commitment order, indicating that Mr. Rice was "psychotic" and "unable to perform self care," and sought an order for forced medication. Notes reflect that Mr. Rice was catatonic when he was transferred to Oaklawn and had to be physically lifted out of the police vehicle. Dr. Ceniceros evaluated Mr. Rice and noted that he was cooperating, showering, eating, drinking, and taking his medication. Dr. Ceniceros believed that Mr. Rice's resumption of these activities upon being transferred to the hospital suggested he was malingering to get out of jail and found that there was "no probable cause to believe [that he] meets the criteria for involuntary commitment." Dr. Ceniceros diagnosed Mr. Rice with undifferentiated schizophrenia and/or malingering. Dr. Ceniceros again discharged Mr. Rice back to the jail after less than twenty-four hours; he believed Dr. Rohrer could follow

6

up with Mr. Rice. On May 18, Mr. Rice was placed in the administrative segregation unit — Ward 1 — so he could be more readily observed;[1] he remained there until his death on December 18, 2004.

About a month after his release from Oaklawn, Elkhart County Circuit Court Judge Terry Shewmaker found Mr. Rice was responsive in open court and appeared to be well-oriented, and concluded that Mr. Rice was competent to stand trial. Mr. Rice still continued to exhibit bizarre behavior at the jail. For example, on June 25, 2004, an inmate assaulted Mr. Rice by sticking a broomstick through the cell hitting him repeatedly in the groin area. Instead of moving to the back of the cell to avoid the abuse, Mr. Rice stood there, catatonic, without reaction as he was repeatedly struck. Mr. Rice didn't suffered any significant injuries from the incident.

After Mr. Rice was transferred to Oaklawn on May 11, Dr. Rohrer didn't see Mr. Rice again until July 20, when Dr. Rohrer noted that Mr. Rice was completely refusing medications. On August 2, Mr. Rice cut his neck with a disposable razor after removing the plastic shield and bending the razor to an angle; he was transferred to Goshen General Hospital for treatment. Mr. Rice denied that he had tried to commit suicide. Dr. Rohrer spoke to Mr. Rice upon his return from the hospital, and Mr. Rice said he wasn't "psycho"; Dr. Rohrer thought Mr. Rice was malingering. Capt. Rogers discussed this incident with CMS personnel and

---

[1] Prior to this date, Mr. Rice had been placed in the medical ward, disciplinary segregation, and other areas of the jail at different times for varying reasons. Before being placed in administration segregation, Mr. Rice had been in the medical ward.

"they more or less did not constitute this as an act of attempted suicide." In response to Nurse Lambright's questioning about whether he was trying to hurt himself, Mr. Rice responded that he "just felt like it." Similarly, Mr. Rice explained the incident to Nurse Jones by stating, "I just hurt myself." Although correctional reports suggest that Mr. Rice tried to harm himself, Nurse Hess conducted an investigation after the incident and concluded that Mr. Rice didn't attempt suicide. CMS didn't follow its suicide prevention policy after the razor incident. Shortly after, Mr. Rice fainted and cut his head. CMS personnel treated the wound and Nurse Lambright noted that lab work should be done, but no further action was taken.

By September 30, Mr. Rice, at six feet two inches tall, weighed 132 pounds, having lost nearly fifty pounds in the preceding thirteen months while at the jail. On October 5, Dr. Rohrer noted that Mr. Rice had tremendous weight loss, was refusing to eat, refusing his medications, had an area that appeared as early onset of bed sores, and was seriously ill. He also stated that Mr. Rice was dying from malnourishment and had significant psychiatric problems. Dr. Rohrer's notes indicated that "[Mr. Rice] is seriously medically and psychiatry (sic) ill and needs intensive medical care as well as availability of psychiatric care." Dr. Rohrer recommended that Mr. Rice be discharged to a medical facility where psychiatry was available. Dr. Rohrer filed another application for commitment and the court granted a 72-hour commitment order. Although Dr. Rohrer wanted to send Mr. Rice to a psychiatric unit at Elkhart General Hospital, that hospital wouldn't

admit Mr. Rice, so he was instead transferred to Goshen General Hospital — a hospital with no in-patient psychiatric unit. Dr. A. P. Mathew[2] was Mr. Rice's admitting physician.

Dr. Mathew concluded that Mr. Rice had symptoms of dehydration and moderate malnutrition. Mr. Rice was rehydrated and encouraged to eat. Although Dr. Mathew concluded that Mr. Rice was medically stable, she believed he needed psychiatric intervention and sought to have him admitted to Oaklawn. According to Dr. Mathew, Dr. Ceniceros refused to admit Mr. Rice to the Oaklawn facility. Dr. Mathew reported in her notes that "[Dr. Ceniceros] would not accept [Mr. Rice] for admission because on previous admission the patient was found to be malingering." Based on his conversation with Dr. Mathew, Dr. Ceniceros determined that Mr. Rice wasn't an imminent danger to himself or others. Dr. Mathew discharged Mr. Rice and sent him back to jail on October 6, 2004 with the following instructions:

> At this point we can only encourage him to eat and have him obtain the necessary psychiatric care as an outpatient. . . . I recommend possibly some high protein Resource shakes if he will take these and he is discharged on his current medications. The patient is to follow up with the medical physician at the Elkhart County Jail in one week. He is also to follow up with the Oaklawn psychiatrist within one week. . . .

On the day of Mr. Rice's return, Nurse Jones instructed the jail canteen/kitchen to provide him with high protein resource shakes twice a day,

---

[2] Dr. Mathew was a defendant in this action, but was dismissed in the summary judgment order dated January 26, 2009.

along with two milks at all meals and extra juice at breakfast. On October 24, Dr. Alan Bierlein, the jail medical physician who isn't a defendant in this action, ordered Mr. Rice extra food. The nurses testified and records indicate that between October 31 and November 5, Mr. Rice was provided Carnation Instant Breakfast as a supplement to his diet and soon after began receiving high-caloric diet and extra food through Canteen Services. CMS personnel noted that although Mr. Rice refused some meals, he often ate his breakfast.[3]

Dr. Rohrer didn't examine Mr. Rice again until November 9, when he noted the following: "Refuses to communicate and closing eyes. Is observed at times getting up and eating and can run through the unit (did this recently), but refuses all help and has to practically be carried to get shower by staff. Uncompt., caked feces, refusing all meds." Dr. Rohrer assessed that not much had changed with Mr. Rice's condition and signed a physician's order stating: "Discontinue Seroquel, Haldol, & Cogentin - Nurse is to ask him once weekly if he will take his medication. If he says yes, then resume med. at same dose - I am to see in 1 mo." Joshua Shaw, an inmate in an adjacent cell, observed that Mr. Rice was always naked, had a total lack of personal hygiene, feces on his body, urine throughout his cell, and rotten, uneaten food in his cell. Capt. Rogers was aware of Mr. Rice's deteriorating condition and had informed Sheriff Books that Mr. Rice wasn't

---

[3] The Estate submitted a declaration from inmate Joshua Shaw stating that if Mr. Rice's "breakfast sack was left between his cell door window bars, inmates would snatch the same . . . this would also occur with his lunch and dinner." Apparently, realizing that this was a problem, in a memo dated July 6, 2004, Capt. Rogers informed Lt. Call, among others, that Mr. Rice was not eating and that the officers should leave his meals inside his cell for consumption.

providing his own basic hygiene, at times required assistance with showers, wasn't always responsive, and sometimes refused food.

The summary judgment record contains evidence that the nurses were trying to care for Mr. Rice. The CMS defendants presented evidence that they generally saw Mr. Rice several times a day between his October 6 return from the hospital and his death.[4] Nurse Makousky testified that the nurses brought Mr. Rice extra snacks and encouraged him to eat. Nurse Jones testified that the nurses sometimes visited Mr. Rice six times a day and she personally assisted Mr. Rice with his hygiene. The nurses also often tried to coax Mr. Rice to take his medication, but their efforts were rarely successful.

On December 6, 2004, Judge Shewmaker signed an order finding Mr. Rice incompetent to stand trial and ordering him transferred to a mental facility for treatment. The Logansport State Hospital accepted Mr. Rice for admission, but had no bed available at that time. The Sheriff's Department was awaiting an order from the hospital to transport Mr. Rice, but before the order arrived, Mr. Rice was

---

[4] The Estate didn't dispute that asserted fact in response to the defendants' "Statement of Material Facts," leaving the fact admitted to exist without controversy. *See* IND. N.D.L.R. 56.1(b). The Estate presents evidence that "[b]etween October 6, 2004, when [Mr. Rice] returned to jail from Goshen General Hospital, and October 25, 2004, there is no contact/charting by CMS or Oaklawn," but this isn't a denial. The Estate also presents a declaration from Mr. Shaw who stated that he "never saw, at any time, any of the nurses give any treatment or care to [Mr. Rice]," but Mr. Shaw's vague assertion that he didn't "see" the nurses provide "treatment"or "care" doesn't raise a genuine issue of material fact. Mr. Shaw declares that he could see Mr. Rice from a reflector glass in his cell, but it is unclear whether he could actually see what the nurses were doing in Mr. Rice's cell or whether he was regularly watching or paying attention to what was occurring in Mr. Rice's cell. Further, Mr. Shaw doesn't state whether the nurses visited Mr. Rice, only that he never saw them provide "treatment" or "care" to Mr. Rice, but it isn't clear what Mr. Shaw means by "treatment" or "care." Simply put, Mr. Shaw's affidavit is too vague to create a genuine issue of material fact in this regard. *See generally* Fast Tek Group, LLC v. Plastech Engineered Prods., Inc., No. 1:05-CV-01868, 2006 WL 2228960, at *7 (S.D. Ind. Aug. 3, 2006).

11

found dead in his cell in the early morning hours of December 18, 2004. In the several hours preceding his death, Mr. Shaw heard Mr. Rice gulping water and vomiting in his cell. Mr. Shaw and other inmates kicked their cell doors trying to get someone to check on Mr. Rice, but nobody came. Mr. Rice was still being housed in administrative segregation and the jail's policy required the guards to check on the inmates at least every hour, but neither the medical nor correctional defendants on duty during third shift — Elkhart County Jail officers Samantha Werth, Jennifer Shelton, Kimberly Baxter, and Scott Eisenhower and CMS nurse Lambright — came to check on Mr. Rice.

There appears to be no disagreement among the parties that Mr. Rice died as a result psychogenic polydipsia (compulsive water drinking), which can occur in the course of schizophrenia. The excessive water intake leads to inappropriate ADH secretion, resulting in a lethal loss of serum sodium.[5] The Estate's expert, Dr. Shiener, acknowledged that water intoxication or excessive water consumption by Mr. Rice played a role in his death and that there was no warning to the medical staff or the corrections/jail officers that Mr. Rice had ever consumed excessive amounts of water before. The Estate presents evidence, though, that Mr. Rice was also malnourished and dehydrated immediately prior to the events

_____

[5] The Estate's preliminary evidence suggested Mr. Rice died of malnutrition and complications as a result of self imposed starvation. *See* Court's Opinion and Ord. dated January 26, 2009 (document # 280). The defendants' experts and one of plaintiff's experts now agree that Mr. Rice's death was the result of drinking excessive amounts of water. Although the plaintiff has attached an expert report indicating that Mr. Rice died from starvation/malnutrition, in its response brief, the Estate didn't dispute the asserted fact that Mr. Rice died from drinking excessive amounts of water as a condition of his schizophrenia and at least implicitly agreed that this was the cause of his death.

leading to his death and this may have been a contributing factor in the cause. Although Mr. Rice didn't lose any further weight from the time of his discharge from Goshen Hospital until his death, defense expert Dr. Bermudez opined that Mr. Rice had moderate to severe malnutrition and required medical care to monitor his weight, vital signs, fluids, and electrolyte status.

There is evidence that Mr. Rice would have been less likely to drink excessive amounts of water had he been taking his medication. Defense expert Dr. Scherb testified that given Mr. Rice's weight loss and mental illness, it would have been reasonable to get a court order providing for forced medication and feeding. The Estate's expert, Dr. Spitz, concluded that Mr. Rice died as a result of untreated schizophrenia, and further opined that his death was predictable given Mr. Rice's severe mental illness.

### C. Pepper Spray and Use of Restraints

There were instances when the officers physically confronted and restrained Mr. Rice at the jail. On November 8, 2003, Mr. Rice was non-compliant with staff orders, so he was put into a restraint chair for an unknown period of time. On November 16, 2003, Mr. Rice got into an altercation with his cell mate and after the altercation, when Mr. Rice didn't exit his cell as requested, Officer Shelton sprayed him with pepper spray and placed him in a restraint chair for more than eighteen hours. Although Mr. Rice wasn't showered after the incident, the pepper spray was rinsed from his skin and eyes. Mr. Rice was also given several offers to

leave the restraint chair, but he refused. Also, in August 2004, after Mr. Rice cut his neck with a razor, he was placed in a restraint chair upon his return from the hospital for eighteen hours to ensure that he wouldn't harm himself or others.

## II. MOTIONS TO STRIKE

The parties have filed various motions to strike in this matter that will affect the court's discussion on the defendants' motions for summary judgments, so the court begins its analysis by addressing these motions.

### A. The Estate's Motion to Strike CMS Defendants' and Elkhart County Defendants' Briefs and Statement of Facts

The Estate moves to strike the CMS defendants' and Elkhart County defendants' briefs and statement of facts, contending that they don't contain proper citations to the evidence and exceed the page limit of Local Rule 7.1(d). Although the memoranda of CMS and Elkhart County in support of their motions for summary judgment are within the twenty-five page limit, they have each separately filed a statement of facts; CMS' statement of facts is twenty-two pages and Elkhart County's is seventy-six pages. The Estate further notes that although the court permitted the defendants leave to jointly file one additional twenty-five page memorandum addressing common issues of law and fact, the Elkhart County defendants used this opportunity to address only its defenses and so, the Estate argues, they took an unauthorized second bite at the apple. The Estate also

asserts that the defendants' statements of material facts are flawed in that they don't assign deposition or affidavit exhibits by number or letter, improperly requiring the court to find where depositions and affidavits are located.

The court declines to strike the CMS and Elkhart County defendants' briefs and statement of facts; they comply with the Local Rules. As to the page limit, Local Rule 7.1 provides that "no brief shall exceed 25 pages in length (exclusive of any pages containing a table of contents, a table of authorities, and appendices)." N.D. IND. L.R. 7.1. Local Rule 56.1 requires parties to file a "Statement of Material Facts" in support of a motion for summary judgment, but allows this statement to be submitted separately "as an appendix." N.D. IND. L.R. 56.1. A statement of material facts filed in support of a motion for summary judgment doesn't count against the twenty-five page limitation. *See also* <u>Mays v. City of Hammond</u>, 442 F. Supp. 2d 587, 595 (N.D. Ind. 2006). One might correctly question the wisdom, from an advocacy standpoint, of burdening the court with so much paper — especially in support of the proposition that no material facts are disputed — but doing so didn't violate the local rules in this case.

The Elkhart County defendants' additional legal memorandum was proper. The court authorized the defendants to jointly file one additional legal memorandum addressing common issues of law and fact. Elkhart County defendants filed the brief after contacting and discussing the filing with the other defense counsel of record. No defendant objected to Elkhart County's brief or filed its own separate brief. It isn't the court's role to second-guess the defendants'

collective decision allowing the Elkhart County defendants the opportunity to utilize the additional brief for their defense.

Further, while the defendants might have been clearer when designating evidence, finding the evidence in the record supporting their factual contentions is relatively easy. Both parties provide specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts designated. The defendants' statements of facts are supported by appropriate citations and are in compliance with the local rules. *See* N.D. IND. L.R. 56.1 (the movant must file a "'Statement of Material Facts,' supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence, as to which the moving party contends there is no genuine issue."). The court declines to strike these documents.

### B. Defendants' Motions to Strike Inmate Affidavits

The defendants move to strike Montie George's and John Neace's affidavits and Michael Brown's declaration offered by the Estate because the Estate didn't disclose those witnesses as required by Federal Rule of Civil Procedure 26(a). The CMS defendants also move to strike those affidavits/declaration, and Joshua Shaw's declaration as well, for lack of evidentiary foundation.

The defendants' motions to strike Mr. George's and Mr Neace's affidavits and Mr. Brown's declaration are well-taken. Neither the Estate nor any other party disclosed these witnesses in their pretrial disclosures; they were first disclosed by

the Estate in its response to the defendants' motions for summary judgment. Rule 37(c) of the Federal Rules of Civil Procedure provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1); *see also* David v. Caterpillar, Inc., 324 F.3d 851, 856-857 (7th Cir. 2003). The Estate doesn't provide any justification as to why it didn't disclose the witnesses as required by Rules 26(a) and (e). Instead the Estate asserts that the defendants won't suffer prejudice from the late disclosures because the Estate obtained knowledge of the affiants and declarant from the defendants during discovery in this matter, so the defendants were aware that these individuals could be potential witnesses.

Obtaining the witnesses' names through defendants' discovery didn't relieve the Estate of its obligation to supplement its Rule 26(a) disclosures. *See* FED. R. CIV. P. 26(e). The discovery deadline in this matter, excluding expert discovery, closed on July 2, 2008, and the dispositive motion deadline was November 17, 2008. The defendants aren't required to guess which of the many individuals identified during discovery the Estate intends to use to support its claims — that is the sort of indirection the disclosure rules are designed to avoid. The nondisclosure isn't harmless since the defendants didn't take depositions of people whose testimony, in affidavit form, might create factual disputes. The defendants had no opportunity to depose these witnesses or review their affidavits before

drafting and filing their summary judgment motions and so are prejudiced by the late disclosure. These documents therefore are stricken.

That leaves Mr. Shaw's declaration. The Estate properly disclosed Mr. Shaw in its Rule 26(a) disclosures, but CMS defendants contend that his declaration should be stricken nevertheless for insufficient evidentiary foundation. CMS asserts that Mr. Shaw's testimony about the night of Mr. Rice's death can't be based on personal knowledge because it includes visual observations not possible by an inmate confined to a cell. CMS further contends that because Mr. Shaw doesn't list dates of his observations, the declaration is inadmissible for vagueness.

The court agrees with the Estate that CMS defendants' arguments generally go to credibility, not admissibility. *See* <u>Payne v. Pauley</u>, 337 F.3d 767 (7th Cir. 2003). Rule 56(e) provides that affidavits filed in opposition to summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED. R. CIV. P. 56(e)(1). To be based on personal knowledge, affidavit testimony must be "grounded in [the affiant's] observation or other first-hand personal experience." <u>Wagner-Garay v. Fort Wayne Cmty. Schs.</u>, 255 F. Supp. 2d 915, 917 (N.D. Ind. 2003) (*quoting* <u>Visser v. Packer Eng'g Assoc., Inc.</u>, 924 F.2d 655, 659 (7th Cir.1991)). Mr. Shaw's declaration provides a general idea of the time frame and his location to Mr. Rice in relation to his testimony. Mr. Shaw states that in the fall of 2004 he was located in a cell in Ward 1 next to Mr. Rice and he was

there through he time of Mr. Rice's death. Mr. Shaw further states: "I could . . . hear what was going on in [Mr. Rice's] Cell due to our close proximity, and further, I could observe inmate Rice by looking at the reflector glass opposite our cell's." Mr. Shaw has personal knowledge of such observations even if his averments are general and vague in certain respects. The court will not strike the declaration.

As already explained, parts of the declaration are too vague to create a genuine issue of material fact in light of the specific evidence presented by the defendants. Instead of striking the declaration, the court limits its reliance on the declaration to the extent Mr. Shaw's statements are sufficient to raise an issue fact. *See* Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163, 315 F.3d 817, 822 (7th Cir. 2003) ("[T]o withstand summary judgment, the non-movant must allege specific facts creating a genuine issue for trial and may not rely on vague, conclusory allegations.").

### C. The Estate's Motion to Strike Dr. Pless's Affidavit

The Estate moves to strike the affidavit of Dr. Pless, submitted by Oaklawn and Dr. Rohrer with their combined reply brief. The Estate contends the following conclusions in Dr. Pless's affidavit weren't properly disclosed in Oaklawn's Rule 26(a) expert disclosures or by Dr. Pless during his deposition: "Polydipsia is exceedingly rare," Pless Aff., ¶ 20; "In fact, the cause of polydipsia is unknown," Pless Aff., ¶ 20; "The chance that someone will die from polydipsia is exceedingly remote," Pless Aff., ¶ 21; and, "The chance that Rice would die from ingesting

excessive amounts of water was infinitesimally low, one in a million," Pless Aff., ¶ 21. The Estate contends that this is "new evidence" and in certain instances contradicts Dr. Pless's initial opinion, when Dr. Pless concluded that the condition causing the consumption of excessive water is commonly seen in schizophrenic patients. The Estate also contends that the affidavit is inadmissible because the statements are speculative and lack foundation.

The court agrees with the Estate and declines to allow Oaklawn to supplement its expert's opinion in its reply brief. Oaklawn has provided no justification as to why these opinions weren't included in its Rule 26(a)(2) disclosures, brought forth during Dr. Pless's deposition, or included as part of its designated evidence in support of its summary judgment motion. Even if not necessarily contradictory to his initial opinion, Dr. Pless's opinion in his affidavit certainly shows a marked change in emphasis and is something that one would expect to find in his initial report. *See* <u>Salgado v. General Motors Corp.</u>, 150 F.3d 735, 741 n.6 (7th Cir. 1998) (stating that Rule 26(a)(2) requires "detailed and complete" report "to conserve resources"); <u>Ciomber v. Cooperative Plus, Inc.</u>, 527 F.3d 635, 641 (7th Cir. 2008) (finding that plaintiff couldn't cure the expert report's shortcomings by later deposition testimony). The Estate will suffer prejudice by allowing this late-filed opinion because it didn't have an opportunity to question Dr. Pless on these conclusions or respond to Oaklawn's reply brief. The court grants the Estate's motion to strike Dr. Pless's affidavit.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact couldn't find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Crull v. Sunderman, 384 F.3d 453, 459-460 (7th Cir. 2004). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004); Rand v. CF Indus., Inc., 42 F.3d 1139, 1146 (7th Cir. 1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors.").

The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in his favor. Lawrence v. Kenosha County, 391 F.3d 837, 842 (7th Cir. 2004); see also Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) ("As we have said before, summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show

what evidence it has that would convince a trier of fact to accept its version of events.'" (citation omitted)); <u>Anderson v. Liberty Lobby</u>, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

IV. Motions for Summary Judgment

The Estate raises numerous federal claims in its amended complaint arising under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution; 42 U.S.C. § 1983; 42 U.S.C. § 1988 (Counts 1 and 2); and various Indiana state law claims (Count 3). The Estate's federal claims in Counts 1 and 2 are based on the condition of Mr. Rice's confinement, his placement in solitary confinement, failure to protect, use of excessive force, and failure to provide medical and mental health treatment.

The court disagrees with the Estate's assertion that the Elkhart County and CMS defendants only sought summary judgment as to the Estate's claim of deliberate indifference to Mr. Rice's medical and mental health needs. The defendants moved for partial summary judgment as to all of the Estate's federal claims; they brought their motions for summary judgment as to the Estate's claims under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the

Constitution and 42 U.S.C. §§ 1983 and 1988.[6] Although the defendants focused their argument on the Estate's Fourteenth Amendment claim of deliberate indifference to Mr. Rice's medical and mental health needs, they presented evidence on the Estate's due process claims and claims relating to excessive force, failure to protect, and conditions of confinement. The defendants met their initial burden under Rule 56 of "'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case," thereby shifting the burden to the Estate to come forward with evidence in support of these claims. *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 325 (1986) (stating that where the non-moving party would have the burden of proof at trial, the moving party isn't required to support its motion with affidavits or other similar materials negating the opponent's claim); <u>Green v. Whiteco Indus., Inc.</u>, 17 F.3d 199, 201 n.3 (7th Cir. 1994) (same). Summary judgment is the "put up or shut up" moment in a lawsuit. <u>Johnson v. Cambridge Indus.</u>, 325 F.3d at 901.

---

[6] For example, the Elkhart County defendants stated in their brief on the individual capacity claims that they were moving for summary judgment "as to Count I (Violation of Civil Rights Pursuant to the Eighth and Fourteenth Amendments to the Constitution and 42 U.S.C. §1983 - All Defendants) and Count II (Violation of Civil Rights Pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteen Amendments to the Constitution and 42 U.S.C. §§ 1983, 1988 - All Defendants), of Plaintiff's Amended Complaint." (Doc. # 227, pp. 1-2). In Sheriff Books' motion, he stated that he was moving for summary judgment "on all of Plaintiff's claims brought against Sheriff Books in his official capacity pursuant to federal statutory or constitutional law (Counts I and II of Plaintiff's Amended Complaint)." (Doc. # 196). Similarly, the CMS defendants moved for summary judgment against the Estate "as to Count I . . . and Count II . . . and, to the extent it asserts a claim under 42 U.S.C. § 1983, as to Count III (Gross Negligence, etc.) of Plaintiffs' Amended Complaint." (Doc. 211).

*A. Fourth, Fifth, Sixth, and Eighth Amendment Claims*

The Estate doesn't present facts supporting its claims arising under the Fourth, Fifth, Sixth and Eighth Amendments and so has effectively abandoned these claims. *See* Palmer v. Marion County, 327 F.3d 588, 597-598 (7th Cir. 2003) (finding that claims not addressed in a summary judgment opposition brief were abandoned). The court addresses these claims in a summary fashion.

The Fourth and Eighth Amendment don't apply to pre-trial detainees such as Mr. Rice. Lopez v. City of Chicago, 464 F.3d 711, 719 (7th Cir. 2006); Zentmyer v. Kendall County, 220 F.3d 805, 810 (7th Cir. 2000). The Fifth Amendment only applies to federal officials, Missouri v. Seibert, 542 U.S. 600, 607 (2004), and none of the defendants in this case were federal officials. Finally, there are no facts supporting a Sixth Amendment violation.

The relevant inquiry as to the defendants' actions in this case comes under the Fourteenth Amendment through 42 U.S.C. § 1983. A pretrial detainee derives his right from the Fourteenth Amendment's Due Process Clause because the state can't punish a pretrial detainee without securing a formal adjudication of guilt. Brown v. Budz, 398 F.3d 904, 910 (7th Cir. 2005). There is little practical difference between the standards applied to claims under the Eighth and Fourteenth Amendments. Weiss v. Cooley, 230 F.3d 1027, 1032 (7th Cir. 2000). "The protections for pre-trial detainees are at least as great as the Eighth Amendment protections available to a convicted prisoner, and [courts] frequently consider the standards to be analogous." Washington v. LaPorte County Sheriff's

24

Dep't, 306 F.3d 515, 517 (7th Cir. 2002) (internal citations and quotations omitted).

### B. Conditions of Confinement

The Estate contends Mr. Rice's conditions of confinement constituted cruel and unusual punishment because his cell was filthy, contained rotten food, and feces and was unsanitary. The record also reveals that Mr. Rice had taken only a few showers from November 2003 until August 2004, was dirty, and often smelled. Inmate Shaw observed that Mr. Rice was always naked, had a total lack of personal hygiene, feces on his body, urine throughout his cell, and rotten, uneaten food in his cell. The court has found that a "lack of sanitary conditions . . . may qualify as a denial of the 'minimal civilized measure of life necessities.'" Townsend v. Fuchs, 522 F.3d 765, 774 (7th Cir. 2008) (*quoting* Gillis v. Litscher, 468 F.3d 488, 494 (7th Cir. 2006)). The summary judgment record indicates that Mr. Rice created the filthy, unsanitary conditions; he wasn't prevented from cleaning his cell or taking showers, and jail personnel occasionally showered Mr. Rice and cleaned his cell. This isn't a case where Mr. Rice was placed in a cell that already had feces on the walls, as in Vinning-El v. Long, 482 F.3d 923, 924 (7th Cir. 2007); instead, the conditions Mr. Rice endured were self-inflicted and don't give rise to a claim of deliberate indifference. *See, e.g.,* Isby v. Clark, 100 F.3d 502, 505-506 (7th Cir. 1996) ("[I]t's the 'practice of the ISP to leave feces and blood on the walls and floor of the SMU cells if they were put there by the residing inmate.'

If feces were on the wall — but [the inmate] put it there — the claim on this point that the defendants violated the Eighth Amendment would lose a lot of its steam. . . . [A]n inmate who causes filthy conditions to exist may not have a cruel and unusual leg to stand on."). Under the circumstances of this case, Mr. Rice's unsanitary condition wasn't sufficiently serious to constitute a constitutional violation. Prison conditions may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment. Farmer v. Brennan, 511 U.S. 825, 833-834 (1994). The court recognizes that Mr. Rice's behavior was driven by his mental illness and so considers this behavior when addressing his need for mental health treatment.

*C. Administrative Segregation*

The Estate contends there are genuine issues of material fact as to its constitutional claims arising from Mr. Rice's prolonged placement in administrative segregation. The evidence, even when seen in the light most favorable to the Estate, shows that Mr. Rice was placed in an administrative segregation unit for his own safety. From May 18, 2004 until his death, Mr. Rice was in an administrative segregation unit — Ward 1 — so he could be monitored more readily. The Estate provides little support for its argument that Mr. Rice's placement in the administrative segregation unit resulted in a violation of his constitutional rights.

Not every restriction on a pre-trial detainee constitutes punishment. Due process requires that a pretrial detainee receive prior notice and opportunity to be heard before being placed into segregation as punishment, but no such process is required when placement is merely for legitimate administrative reasons. Higgs v. Carver, 286 F.3d 437, 438 (7th Cir. 2002). The government may take measures that are reasonably calculated to effectuate the pretrial detention in order to manage the facility. Id. The court in Higgs explained that "managerial reasons" can include protecting a detainee from himself or other inmates. Id.

Courts also have noted that administrative segregation can rise to the level of cruel and unusual punishment depending on the duration and nature of the segregation and the existence of feasible alternatives. Walker v. Shansky, 28 F.3d 666, 673 (7th Cir. 1994). To establish a claim that prison conditions violate the Constitution, a prisoner's burden involves both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Delaney v. DeTella, 256 F.3d 679, 683 (7th Cir. 2001). The alleged deprivation must be, objectively, sufficiently serious and a prison official must be shown to have acted with deliberate indifference. Id. These requirements apply to both convicted prisoners and pretrial detainees. Mathis v. Fairman, 120 F.3d 88, 91 (7th Cir. 1997).

The Estate presents expert testimony from Dr. Joe Goldenson suggesting that Mr. Rice should have been placed in a medical unit instead of administrative segregation because "[i]t is a well established fact that individuals with psychiatric problems [such as Mr. Rice] decompensate when they are in extreme isolation."

27

First, the undisputed evidence suggests that the nursing staff visited Mr. Rice regularly, and Mr. Shaw stated that he "had numerous contacts with [Mr.] Rice during [his] one hour 'out.'" There is no evidence that had Mr. Rice wanted out more often, his request would have been denied; the evidence indicates that Mr. Rice chose to stay in his cell. Second, the Estate doesn't allege that his placement in administrative segregation was intended as punishment or as a disciplinary measure. The CMS defendants presented evidence that Mr. Rice was placed in administrative segregation so he could be more closely monitored; the Estate doesn't dispute this fact. Third, aside from isolation, the Estate doesn't suggest that the conditions of administrative segregation differed from the conditions in the jail's general population, nor does the Estate contend Mr. Rice should have been placed in the general population.[7] The evidence is insufficient to support an inference that the defendants were acting with deliberate indifference by placing Mr. Rice in the administrative segregation unit. *See generally* <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).

### D. Excessive Force Claims

The Estate claims questions of fact surround the defendants' use of excessive force in pepper spraying Mr. Rice and restraining him in a chair on two separate occasions for approximately eighteen hours. Again, the Estate offers

---

[7] The Estate contends Mr. Rice should have instead been kept in the medical ward, but doesn't indicate how placing him in the medical ward would have improved his condition or allowed for better observation.

minimal evidence to support its claims in this regard. The evidence, even in light most favorable to Mr. Rice, suggests that on November 16, 2003, Mr. Rice got into an altercation with his cell-mate, and after the altercation, when Mr. Rice didn't leave his cell as requested, Officer Shelton sprayed him with pepper spray and placed him in a restraint chair. Although Mr. Rice wasn't showered after the incident, the pepper spray was rinsed from his skin and eyes. Mr. Rice refused several offers to leave the restraint chair. In August 2004, upon Mr. Rice's return from the hospital after the razor incident, he was placed in a restraint chair for eighteen hours. The defendants maintain he was placed in the chair to permit easy observation and to ensure that he would not harm himself or others.

The Fourteenth Amendment protects a pretrial detainee from the use of excessive force that amounts to punishment. Graham v. Connor, 490 U.S. 386, 395 n.10 (1989); Bell v. Wolfish, 441 U.S. at 535. The plaintiff must prove he suffered some harm attributable to the use of force that was clearly excessive to the need presented and was objectively unreasonable in light of the facts and circumstances. Wilson v. Williams, 83 F.3d 870, 876 (7th Cir. 1996). A number of objective factors are relevant to the determination of whether a correctional officer's use of force was utilized with an intent to punish: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the officer; and (5) any effort made to temper the severity of a forceful response. Wilson v. Williams, 83 F.3d at 876 (citing Hudson v. McMillian, 503 U.S.

1, 7 (1992)). "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S. at 6-7.

The defendants are entitled to summary judgment as to the Estate's excessive force claims because, even taking all the facts and reasonable inferences in light most favorable to the Estate, the evidence demonstrates that the force utilized by the officers wasn't excessive, but was justified and restrained, applied in a good faith effort to maintain discipline, and didn't cause Mr. Rice injury. *See* <u>King v. Price</u>, 221 F.3d 1338, at *2 (7th Cir. 2000) (unpublished) (finding that use of pepper spray to subdue inmate didn't constitute cruel and unusual punishment).


### E. Failure to Protect Claim

"The due process clause protects pretrial detainees from deliberate exposure to violence and from the failure to protect when prison officials learn of a strong likelihood that a prisoner will be assaulted." <u>Swofford v. Mandrell</u>, 969 F.2d 547, 549 (7th Cir. 1992) (citations omitted); *see also* <u>Netter v. Canarecci</u>, No. 3:07-CV-66, 2007 WL 2572393, at *2-*3 (N.D. Ind. Sept. 4, 2007) (addressing failure to protect claim under the Eighth Amendment). The detainee must show that there was a substantial risk beforehand that serious harm might actually occur. <u>Brown</u>

v. Budz, 398 F.3d 904, 910 (7th Cir. 2005). A detainee who alleges a due process violation must show that the officer's failure or refusal to protect the detainee from assault was motivated by "deliberate indifference" or "reckless disregard." Swofford v. Mandrell, 969 F.2d at 549; *see also* Netter v. Canarecci, 2007 WL 2572393, at *2 ("When an inmate is attacked by another inmate, the Eighth Amendment is violated only if 'deliberate indifference by prisoner officials effectively condones the attack by allowing it to happen . . . .'" (*quoting* Haley v. Gross, 86 F.3d 630, 640 (7th Cir. 1996)). Prison officials aren't expected to eliminate the possibility of all dangers and "the right to reasonable protection does not include the right to protection from random acts." McGill v. Duckworth, 944 F.2d at 345 (7th Cir.1991), *overruled on other grounds*, Farmer v. Brennan, 511 U.S. 865 (1994). "[A]n unfortunate random act of violence in a prison . . . does not impose liability on prison officials." Washington v. LaPorte County Sheriff's Dep't, 306 F.3d 515, 519 (7th Cir. 2002).

The Estate contends the prison officials failed to protect Mr. Rice from assault by another inmate who poked Mr. Rice with a broomstick through his cell, hitting Mr. Rice repeatedly in the groin area. Mr. Rice didn't suffer significant injuries and there was no other incident of an inmate assaulting Mr. Rice at the Elkhart County Jail. The record is insufficient for a reasonable jury to find that the prison guards were aware of a substantial risk that Mr. Rice might be harmed. There is no evidence that Mr. Rice expected an attack or that the prison officials should have expected an attack. This random act of violence toward Mr. Rice,

without more, cannot support a Fourteenth Amendment claim for failure to protect.

### F. Mr. Rice's Medical and Mental Health Needs

The court turns to the Estate's remaining claims of deliberate indifference to Mr. Rice's medical and mental health needs. To establish a claim under 42 U.S.C. § 1983, a plaintiff must establish that the defendant was acting under color of state law and deprived the plaintiff of a right or an interest secured by the Constitution or laws of the United States. Jones v. Wilhelm, 425 F.3d 455, 465 (7th Cir. 2005). Conduct that satisfies the state action requirement of the Fourteenth Amendment also satisfies the under color of state law requirement of § 1983. Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 (1982). The Fourteenth Amendment's Due Process Clause protects pretrial detainees under the same standards as the Eighth Amendment. Zentmyer v. Kendall County, Ill., 220 F.3d 805, 810 (7th Cir. 2000).

The Eighth Amendment prohibits cruel and unusual punishment, and as incorporated through the Fourteenth Amendment, this prohibition imposes a duty on states to provide adequate medical care to incarcerated individuals. Johnson v. Doughty, 433 F.3d 1001, 1010 (7th Cir. 2006). Inmates similarly have a right to care for psychological conditions, including a right to be protected from self-destructive tendencies. See Hull v. Ryan, 957 F.2d 402, 405-406 (7th Cir. 1992) ("[P]olice officers [can] not be deliberately indifferent to a detainee who is in need

of medical attention because of mental illness or who is a substantial suicide risk."). State actors fail in this duty if "they display deliberate indifference to serious medical needs of prisoners." <u>Johnson v. Doughty</u>, 433 F.3d at 1010 (internal quotations and citations omitted); *see also* <u>Johnson v. Snyder</u>, 444 F.3d 579, 584 (7th Cir. 2006).

### 1. Dr. Ceniceros - State Actor

Dr. Ceniceros is the only defendant who contends he wasn't a state actor for purposes of Mr. Rice's Section 1983 claims. For a private party's conduct to be deemed to be state action, there generally must be a sufficiently close association between the state and the private conduct so that the action "may be fairly treated as that of the State itself." <u>Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 295 (2001) (*quoting* <u>Jackson v. Metropolitan Edison Co.</u>, 419 U.S. 345, 351 (1974)). The essential question is whether the nominally private conduct is properly attributable to the state. 531 U.S. at 295. This is a fact-intensive inquiry that "is a matter of normative judgment, and the criteria lack rigid simplicity." <u>Id.</u> at 295-296. The Supreme Court has set forth a number of tests for deciding whether a private actor has engaged in state action for § 1983 purposes, one of which is relevant to this case: the "public function" test, where private actors perform functions traditionally reserved exclusively to the state. <u>Jackson v. Metro. Edison Co.</u>, 419 U.S. at 352; *see also* <u>Wade v. Byles</u>, 83 F.3d 902, 905 (7th Cir. 1996).

In <u>West v. Atkins</u>, the Supreme Court held that a private physician who contracted with a state prison to provide medical services at the prison on a part-time basis acted under color of state law for purposes of § 1983 when treating an inmate's injury. <u>West v. Atkins</u>, 487 U.S. 42, 54 (1988). The Court reasoned that the state delegated its affirmative obligation to provide adequate medical care to the physician, and the physician voluntarily assumed that obligation by contract. <u>Id.</u> at 56. The Court noted that the state isn't relieved of its duty to provide adequate medical treatment by contracting out prison medical care to a private physician. <u>Id.</u> "It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State." <u>Id.</u> at 55-56. The dispositive issue is the relationship between the state, the physician, and the prisoner. <u>Id.</u> at 56.

The <u>West</u> Court made it clear that "medical care providers working in a prison are state actors," and its holding has been extended to "hospitals and physicians that provide care outside the prison facility . . . when they work pursuant to contract." <u>Sykes v. McPhillips</u>, 412 F. Supp. 2d 197, 202 (N.D.N.Y. 2006). The Fourth Circuit has extended the <u>West</u> rationale to physicians who provide medical services to prisoners offsite, even without a contract between the physician and the state. <u>Conner v. Donnelly</u>, 42 F.3d 220, 225 (4th Cir. 1994). The <u>Conner</u> court stated that <u>West</u> made it clear that "the provision of medical services to prison inmates is traditionally the exclusive prerogative of the state." 42 F.3d at 224. The court explained:

34

> If a physician treating a prisoner whether by contract or by referral -
> misuses his power by demonstrating deliberate indifference to the
> prisoner's serious medical needs, the prisoner suffers a deprivation
> under color of state law. The source of the deprivation does not
> change because the physician has no contractual relationship with
> the state: the physician acts under color of state law because the
> state has incarcerated the prisoner and denied him the possibility of
> obtaining adequate medical care on his own.

Id. at 225. The Conner court held that the physician was a state actor because the prison referred the inmate to the physician, the physician voluntarily accepted the patient, and the prison paid the physician for his services. Id.; *see also* Lewellen v. Schneck Medical Ctr., No. 4:05-CV-83, 2007 WL 2363384, at *9-*10 (S.D. Ind. Aug. 16, 2007) (citing favorably to the reasoning in Conner; finding that a private physician acting as an independent contractor to a county hospital could be a state actor when providing medical care to a detainee).

Many other courts disagree, concluding that West doesn't extend to private physicians who perform medical services offsite and not pursuant to a contract with the state. *See, e.g.*, Styles v. McGinnis, 28 Fed. Appx. 362. 364 (6th Cir. 2001) (unpublished) (finding emergency room physician wasn't a state actor because the hospital had no contract with state and the physician was an independent contractor); Steele v. Meade County Jail Officials, No. 06-5087, 2008 WL 4449924, at *2 n.1 (D.S.D. Sept. 18, 2008) and cases cited therein (stating that court "can discern no consistent rule regarding whether a private doctor at a private facility is a state actor under § 1983").

The Seventh Circuit hasn't addressed this issue, but has stated that the West rationale is that "an inmate must rely entirely on prison authorities to treat his medical needs" and "[a]n inmate realistically views his provided physician as an extension of the state." Cunningham v. Southlake Ctr. for Mental Health, 924 F.2d 106, 109 (7th Cir. 1991); see also Wade v. Byles, 83 F.3d 902, 906 (7th Cir. 1996) (stating that the "language in West indicates that a state cannot limit its accountability for the performance of functions that it has an affirmative constitutional obligation to provide."). Our court of appeals explained that West is grounded along lines similar to the "public function" test. Wade v. Byles, 83 F.3d at 906, n.6.

Oaklawn contracted with CMS to provide mental health treatment to Elkhart County Jail inmates. In its agreement with CMS, Oaklawn agreed to provide off-site services to the inmates after CMS determined that such services were required. Dr. Rohrer provided mental health treatment to Mr. Rice at the jail, but on October 28, 2003 and May 11, 2004, when Dr. Rohrer decided Mr. Rice needed more extensive care, he sought a court order to commit Mr. Rice to Oaklawn. In his petitions, Dr. Rohrer indicated that Oaklawn had agreed to accept Mr. Rice for emergency treatment. Dr. Ceniceros treated Mr. Rice on both occasions at the Oaklawn facility; each time, Dr. Ceniceros discharged Mr. Rice back to jail within twenty-four hours.[8] Dr. Rohrer sought a third involuntary

---

[8] In December 2003, Dr. Ceniceros also evaluated Mr. Rice as part of a criminal competency exam.

commitment order on October 5, 2004, but this time referred Mr. Rice to Goshen Hospital. Dr. Mathew treated Mr. Rice while at Goshen Hospital and, on October 6, called Dr. Ceniceros seeking transfer of Mr. Rice from Goshen Hospital to Oaklawn; Dr. Ceniceros refused to admit Mr. Rice to the Oaklawn facility.

Nothing in this record suggests Dr. Ceniceros accepted Mr. Rice pursuant to the Oaklawn-CMS contract. The evidence indicates that he accepted him pursuant to the emergency detention orders. The <u>West</u> rationale does not reach a private psychiatrist who accepts an inmate upon an emergency detention order. Although it is a public function of the state to provide medical and mental health care to inmates, providing offsite psychiatric treatment to an inmate pursuant to court order (as opposed to seeking such a court order) is not a function traditionally reserved exclusively to the state. *See, e.g.,* <u>Spencer v. Lee</u>, 864 F.2d 1376 (7th Cir. 1989) (determining that when a private physician and a private hospital commit a mentally disturbed person, they don't act under color of state law). Mr. Rice was committed to Oaklawn upon a state actor's petition, but the services sought through the involuntary commitment are not services traditionally performed by the state.

Dr. Rohrer was carrying out state authority delegated by the Sheriff, through CMS, when he sought involuntary commitment for a prison inmate held by the Sheriff. Dr. Ceniceros was the treating physician, not by virtue of the Sheriff's delegation of responsibility to CMS (and on to Dr. Rohrer), but rather

because a court committed Mr. Rice to another facility — a psychiatric hospital[9] — through a temporary commitment. Analysis would be easier if Dr. Ceniceros and Dr. Rohrer didn't both work for Oaklawn, but Dr. Ceniceros' role was not a public function. Dr. Ceniceros was not a state actor and so is entitled to summary judgment on the Estate's § 1983 claims against him.

### 2. Municipal and Corporate Liability under Section 1983

To establish a claim pursuant to 42 U.S.C. § 1983 against CMS, Oaklawn, or Sheriff Books in his official capacity, the Estate must show a constitutional deprivation by an official policy or custom; a municipality or corporation can't be liable under § 1983 on a respondent superior theory. Monell v. Department of Social Servs. of the City of New York, 436 U.S. 658, 691 (1978) (municipality); Johnson v. Dossey, 515 F.3d 778, 782 (7th Cir. 2008) (private corporation). "[T]he complaint must allege that an official policy or custom not only caused the constitutional violation, but was 'the moving force' behind it." Estate of Sims ex rel. Sims v. County of Bureau, 506 F.3d 509, 514 (7th Cir. 2007). Liability may attach if the plaintiff can demonstrate an official policy through "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread

---

[9] Dr. Ceniceros provided services outside of the prison facility and outside the constraints existing within the jail. The West Court reasoned that "although the provision of medical services is a function traditionally performed by private individuals," the context in which the physician performed medical services distinguishes the relationship from the ordinary physician-patient relationship. West v. Atkins, 487 U.S. at 56, n.15. The Court noted that the physician "carried out his duties at the state prison within the prison hospital [and t]hat correctional setting, specifically designed to be removed from the community, inevitably affects the exercise of professional judgment." Id.

practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." 506 F.3d at 515 (citation omitted). The Estate can make this showing either directly "by demonstrating that the policy itself is unconstitutional," or indirectly "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of the government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned . . . the misconduct of subordinate officers." Woodward v. CMS, 368 F.3d 917, 927 (7th Cir. 2004) (*quoting* Estate of Novack ex rel. v. County of Wood, 226 F.3d 525, 531 (7th Cir. 2000)). "[A] single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act." 368 F.3d at 929. The Estate must show an "affirmative link" between the policy and the alleged constitutional violation. Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985).

Failure to train is a species of deliberate indifference. Erwin v. County of Manitowoc, 872 F.2d 1292, 1297-1298 (7th Cir. 1989). Liability may attach "if persuasive evidence is presented of a training policy or custom, or lack thereof, which reflects a showing of deliberate indifference on the part of a municipality to the constitutional rights of its inhabitants." Palmer v. Marion County, 327 F.3d 588, 597 (7th Cir. 2003) (*citing* City of Canton, Ohio v. Harris, 489 U.S. 378, 389-392 (1989)); *see also* Erwin v. County of Manitowoc, 872 F.2d 1292, 1297-1298 (7th Cir. 1989) ("The inadequacy of police training serves as a § 1983 liability

basis only if the failure to train amounts to 'deliberate indifference' to the rights of persons with whom the police deal."). The Court in City of Canton v. Harris stated that "[i]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390; *see also* Erwin v. County of Manitowoc, 872 F.2d at 1297. A "particular officer's unsatisfactory training cannot alone suffice to attach liability to the state[,]" 872 F.2d at 1298, and a single incident generally cannot establish a failure to train. City of Canton v. Harris, 489 U.S. at 390-391; *see also* Novack v. County of Wood, 226 F.3d at 531 ("[A] single instance of allegedly unconstitutional conduct does not demonstrate a municipality's deliberate indifference to the constitutional rights of its inhabitants."). The deficiency in training must have actually caused the officers' indifference to Mr. Rice's medical and mental health needs. City of Canton v. Harris, 489 U.S. at 391.

*a. Sheriff Books in his Official Capacity*

The Estate contends that Sheriff Books in his official capacity could reasonably be found deliberately indifferent in allowing unwritten customs and practices to flourish and in failing to train his jail staff to recognize and effectively handle mental illness. The Estate points to the following: (I) records reveal that Elkhart County had a policy whereby an inmate, even one suffering from severe

mental illness, couldn't be transferred to a psychiatric facility without Oaklawn's approval; (ii) Sheriff Books was aware of Mr. Rice's mental condition and should have transferred him to a mental health facility; (iii) Sheriff Books never provided any type of mental illness training to Capt. Rogers or Lt. Call or adequate supervision over the treatment of inmates; (iv) even though CMS had a suicide prevention policy, Sheriff Books' staff didn't implement the policy following Mr. Rice's razor incident in August 2004; and (v) on the night of Mr. Rice's death, shift logs reveal that Officer Werth, Officer Shelton, Officer Baxter, and Officer Eisenhour never checked on Mr. Rice even though jail policies required them to do so at least hourly.

The court begins with the Estate's contentions that Elkhart County had an impermissible policy requiring approval of Oaklawn before transferring patients to a psychiatric facility and that Sheriff Books should have transferred Mr. Rice. The Estate's expert Ken Katsaris, a certified Florida law enforcement officer, opines that Sheriff Books, being aware of Mr. Rice's condition, should have released him to a mental health treatment facility. The Estate can establish Section 1983 liability by showing that Mr. Rice was deprived of a federal right as a result of a deliberate act of a decision-maker for the jail. Wagner v. Washington County, 493 F.3d 833, 836 (7th Cir. 2007). "It is true that a single act or decision of a final policymaker can establish municipal policy." Baxter v. Vigo County Sch. Corp., 26 F.3d 728, 735 (7th Cir. 1994) (superceded by statute on unrelated point). The sheriff is a person with final policymaking authority. Trout v. Buie, 653

41

N.E.2d 1002, 1007 (Ind. Ct. App. 1995). A jail officer generally is entitled to defer to a medical professional's judgment about the appropriate way to treat an inmate. <u>Johnson v. Doughty</u>, 433 F.3d at 1010. The jail's practice of deferring to the Oaklawn medical professionals' decision to transfer inmates outside the jail for psychiatric care doesn't constitute deliberate indifference. Additionally, the Estate provides no authority that Indiana sheriffs can release, on their own authority, pretrial detainees who haven't posted a bond set by the court. The Sheriff's deputy spoke with Judge Shewmaker about a release, but the judge didn't order a release.

Although the Estate doesn't contend that the jail's express policies of training were deficient, it contends that Sheriff Books didn't train Capt. Rogers or Lt. Call relating to mental illness or supervise jail personnel in their care of inmates. The issue is whether the training was adequate, and if not, whether the inadequate training can be said to represent policy. <u>Erwin v. County of Manitowoc</u>, 872 F.2d at 1298. There also must be a direct causal link between the policy or custom and the alleged constitutional deprivation. <u>City of Canton v. Harris</u>, 489 U.S. at 385. To resolve the official capacity claim, the court's focus is on the adequacy of the training program in relation to the tasks the particular officers had to perform. <u>Id.</u> at 390.

The Estate points to evidence that Capt. Rogers and Lt. Call knew of Mr. Rice's illness, yet took little action to address Mr. Rice's medical needs. The Estate reasons that there are sufficient facts for a jury to find that had Sheriff Books

provided adequate training and supervision to jail personnel, Mr. Rice would have received the necessary treatment for his mental health condition. CMS and Oaklawn were contractually obligated to provide mental health care to the inmates. The correctional officers relied on the training and expertise of CMS and Oaklawn in providing medical care to Mr. Rice. The Constitution doesn't require the Sheriff to make himself and all below him experts in the medical field, as long as the training is sufficient to funnel special medical needs to medical specialists. *See* Perkins v. Lawson, 312 F.3d 872, 875-876 (7th Cir. 2002) (finding no deliberate indifference where the jail officials relied on the opinion of doctors); Greeno v. Daley, 414 F.3d 645, 656 (7th Cir. 2004) (finding no deliberate indifference where correctional officers referred the inmate's complaints to medical providers who could be expected to address the inmate's condition). Sheriff Books provided Mr. Rice with access to medical treatment through CMS and Oaklawn. On the occasions when Dr. Rohrer believed Mr. Rice needed outside emergency care, Mr. Rice was transferred immediately. There is no evidence that Sheriff Books impeded or obstructed Mr. Rice's medical and mental health treatment. No reasonable trier could find that a lack of training of the correctional officers or supervision by Sheriff Books was the driving force of the alleged constitutional deprivation.

The Estate also contends jail personnel failed to follow jail policies by not placing Mr. Rice on suicide watch after the razor incident and not ensuring that its officers checked hourly on inmates in the segregation ward. "If the same

problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work." Calhoun v. Ramsey, 408 F.3d 375, 380 (7th Cir. 2005). Claims of this nature require "more evidence than a single incident to establish liability." Id. As to the razor incident, Mr. Rice denied that he tried to kill himself and after assessment, Nurse Hess decided Mr. Rice wasn't trying to commit suicide. CMS didn't follow its suicide prevention policy and it was constitutionally appropriate for the jail to rely on CMS's decision in this respect. Even if CMS should have followed its suicide prevention policy, Mr. Rice didn't actively attempt to commit suicide after that incident and there is no causal link between CMS's decision not to place Mr. Rice on suicide watch and Mr. Rice's death from drinking excessive water as a result of his mental illness. Shortcomings in suicide prevention training would be material had Mr. Rice actively committed suicide, but he didn't. Moreover, the Estate's evidence of one incident where jail personnel didn't follow policy to check on inmates in the segregation ward hourly is insufficient to state a claim for municipal liability under § 1983.

The record is insufficient to allow a finding that Sheriff Books had an unconstitutional policy, practice, or custom that was the driving force behind the alleged constitutional violation.

*b. CMS*

The Estate doesn't point to any written policy of CMS that was constitutionally deficient. Instead, it contends that CMS, as evidenced through its agents, had a widespread practice of ignoring the serious mental health needs of the inmates and failed to adequately train its employees to address those needs. The Estate also contends CMS had a suicide prevention policy, but was deficient in not implementing the policy after Mr. Rice's failed suicide attempt in August of 2004.

The agreement between CMS and Sheriff Books required CMS to, among other things, meet the standards of the National Commission on Correctional Health Care and state and federal law; maintain credentialing procedures for its professional staff at the jail; discuss healthcare services with the jail administrator and prepare and participate in external reviews, inspections, and audits; have the on-site medical director and psychiatrist available on call twenty-four hours per day; and establish employee training and orientation procedures. CMS provided the full-time equivalent of nine medical employees to inmates, including the equivalent of almost six full-time LPNs and a full-time RN. There were two doctors available at various times to see Mr. Rice at the jail, and CMS achieved and maintained National Commission on Correctional Health Care accreditation. There is no evidence that CMS failed to comply with its contractual obligations.

Even taking the facts in light most favorable to the Estate, no reasonable jury could infer a CMS practice of ignoring the health needs of the inmates. The

evidence indicates that the nurses were making efforts to care for Mr. Rice and report his behavior to Dr. Rohrer. CMS's policies required nurses to perform segregation rounds in the ward three times weekly; the CMS defendants presented evidence that they generally saw Mr. Rice several times a day between his October 6 return from the hospital and his death. Additionally, as already discussed, the evidence is insufficient for a reasonable jury to find that CMS was deliberately indifferent by not placing Mr. Rice on suicide watch, nor is there evidence that this was the moving force behind the alleged violation.

Further, the contract between CMS and Oaklawn reserved mental health treatment decisions to Oaklawn and its physician, Dr. Rohrer. CMS relied on Dr. Rohrer to provide mental health services to the inmates. The evidence indicates CMS personnel regularly communicated with Dr. Rohrer about Mr. Rice's condition and followed Dr. Rohrer's treatment decisions. CMS properly delegated mental health services to other qualified individuals, *see* Johnson v. Doughty, 433 F.3d 1001, 1011 (7th Cir. 2006) (state actors can reasonably rely on the expertise of others), and the court doesn't find that the Constitution requires CMS to disregard the recommendations of experienced mental health care providers.

The summary judgment record contains nothing to support a finding that CMS had a policy or custom that amounts to deliberate indifference. *See* Estate of Sims v. County of Bureau, 506 F.3d 509, 525 (7th Cir. 2007); *compare* Woodward v. CMS, 368 F.3d at 928 (plaintiff presented evidence that CMS had a custom of repeatedly failing to follow proper procedures that led to the plaintiff's

successful suicide attempt). CMS employees and agents (at least those who dealt with Mr. Rice, who are the only ones disclosed in the record) are highly trained professionals who properly relied on and followed Dr. Rohrer's directives as to Mr. Rice's mental health care. Apart from a citation to another case in which CMS employees were held liable, <u>Woodward v. CMS</u>, 368 F.3d at 917, there is no evidence of how CMS handled other cases. Even taking all reasonable inferences in favor of the Estate, the record is insufficient for a jury to find that CMS's actions and the actions of its agents in providing Mr. Rice care establish an unconstitutional policy, practice, or custom that was the moving force behind the alleged constitutional violation.

### c. Oaklawn

The Estate similarly contends Oaklawn, as evidenced through its agents, had a policy and custom of ignoring the serious needs of inmates who were suffering from mental illness. Other than the actions taken by Dr. Rohrer and Dr. Ceniceros, the Estate points to no evidence to support this claim. Dr. Rohrer and Dr. Ceniceros are licensed and credentialed doctors with years of experience in their respective positions, and their interactions with Mr. Rice aren't sufficient to establish an unconstitutional policy, custom, or practice. It is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because "what is needed is evidence that there is a true . . . policy at issue, not a random event." <u>Calhoun v. Ramsey</u>, 408 F.3d 375, 380 (7th Cir.

2005) (where there is no constitutionally suspect policy, the plaintiff "must provide enough evidence of custom and practice to permit an inference that the County has chosen an impermissible way of operating").

### 3. Deliberate Indifference - Individual Capacity Claims

A claim that the defendants violated the Eighth Amendment consists of two elements: (1) an objectively serious medical condition, and (2) deliberate indifference to that condition. Zentmyer v. Kendall County, 220 F.3d at 810.

An objectively serious medical condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." Greeno v. Daley, 414 F.3d at 653. A condition is objectively serious if "failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain." Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir.1997). The Estate has presented evidence to satisfy the objective part of the test; a reasonable jury could conclude that Mr. Rice had a serious medical condition and needed treatment. Mr. Rice was diagnosed with schizophrenia undifferentiated type before he went to the Elkhart County Jail. His records indicate his condition continued to worsen in jail; he often refused to eat, take his medication, and shower, was uncommunicative and inattentive to basic hygiene, laid in his cell catatonic for hours at a time, and exhibited other bizarre behavior, such as walking around naked mumbling to himself. Mr. Rice died from psychogenic polydipsia (compulsive water drinking) as

a result of his schizophrenia. These facts are sufficient to find that Mr. Rice had a serious medical condition.

To demonstrate deliberate indifference — the subjective component of the test — the Estate must show that the defendants "acted with a sufficiently culpable state of mind." Johnson v. Snyder, 444 F.3d at 585 (*quoting* Johnson v. Doughty, 433 F.3d at 1010). Deliberate indifference "is more than negligence and approaches intentional wrongdoing," Collignon v. Milwaukee County, 163 F.3d 982, 988 (7th Cir. 1998) (*citing* Farmer v. Brennan, 511 U.S. 825, 835 (1994)), but a prisoner "need not prove that the prison officials intended, hoped for, or desired the harm that transpired." Walker v. Benjamin, 293 F.3d 1030, 1037 (7th Cir. 2002) (*quoting* Haley v. Gross, 86 F.3d at 641); *see also* Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008) ("[A]lthough deliberate indifference means more than negligen[ce], it is something less than purposeful.").

The standard requires that the state actor have "subjective awareness" of the serious medical need, then act or fail to act with indifference to that need. Riccardo v. Rausch, 375 F.3d 521, 526 (7th Cir. 2004); *see also* Walker v. Benjamin, 293 F.3d at 1037 ("It is enough to show that the defendants actually knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk."). A trier of fact can conclude that a defendant was aware of the risk if the danger was objectively so great that actual knowledge of the danger could be inferred. Walker v. Benjamin, 293 F.3d at 1037 (*citing* Farmer v. Brennan, 511 U.S. at 842).

*a. Elkhart County Defendants*

The Estate brings claims of deliberate indifference against Sheriff Books, Capt. Rogers, Lt. Call, Officer Shelton, Officer Eisenhour, Officer Baxter, and Officer Werth. As noted, to state a claim for deliberate indifference, the plaintiff must show that the state actor had "subjective awareness" of the serious medical need and then acted or failed to act with indifference to that need. Johnson v. Snyder, 444 F.3d at 584.

Officers Shelton, Eisenhour, Baxter, and Werth were on shift the night of Mr. Rice's death. Inmate Shaw provided sworn testimony that on the night of Mr. Rice's death, he:

> mule kick[ed] [his] cell door to get a guard to come into Ward 1 to find out what was wrong with Nick. [] After an initial period of pounding, the lights came on in Ward 1 for a few minutes but no guard ever came. [] As the night wore on, the pattern of Nick drinking water followed by vomiting continued. Other inmates in Ward 1 also could hear what was going on in Nick's cell, as they also mule kicked their doors. [] Several hours prior to medical check, there was a very loud crash/bang that came from Nick's cell. . . . Following the large crash sound, I was able to hear loud snoring/gurgling sound coming from Nick's cell. At this point in time, again, mule kicking doors in Ward 1 started up, no one came.

The evidence doesn't suggest that the pounding on the cells included any warning that Mr. Rice was vomiting or in extremis and needed medical attention. Even if the officers should have been doing rounds pursuant to jail policy or should have responded to the inmate's kicking, the evidence doesn't suggest that the guards were deliberately indifferent to Mr. Rice's medical needs. First, nothing in the summary judgment record supports a finding that the officers on duty were even

aware of Mr. Rice's serious medical condition. Second, even if they knew of Mr. Rice's mental condition, his death arising from drinking excessive amounts of water wasn't foreseeable. The officers weren't alerted that they needed to regularly monitor Mr. Rice to prevent this occurrence. Officers Shelton, Eisenhour, Baxter, and Werth are entitled to summary judgment.

The question remains whether Sheriff Books, Capt. Roger, and Lt. Call, who were aware of Mr. Rice's condition, acted with deliberate indifference to his mental and medical health needs. These defendants could, consistent with the Constitution, rely on the expertise of medical personnel. They provided Mr. Rice with access to needed medical and mental treatment, they didn't interfere with this treatment, and there is no evidence that they withheld relevant information from the medical professionals. The Estate hasn't brought forth evidence sufficient to show that these officers shouldn't reasonably have relied on the medical professionals' judgment. *See* Greeno v. Daley, 414 F.3d at 656 ("Perhaps it would be a different matter if [the corrections official] had ignored Greeno's complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address Greeno's concerns."); Johnson v. Doughty, 433 F.3d at 1011 ("This is not a case . . . of woefully inadequate action evincing a sufficiently culpable state of mind . . . [Warden] Romero reasonably relied on the expertise of the medical professionals and . . . did not act with deliberate indifference toward Johnson."). The county defendants are non-medical personnel who reasonably relied on the

advice of medical professionals. This is especially so in a case such as this, where the medical personnel had access to medical records that federal law prevented the officers from seeing.

### b. Medical Defendants

The medical defendants are Ms. Hess, Ms. Jones, Ms. Lambright, Ms. Bell, Ms. Makousky, Ms. Miller (all of CMS), and Dr. Rohrer. A reasonable jury could find that the medical defendants were aware of Mr. Rice's serious medical condition, but the summary judgment record can't support a finding that they acted with deliberate indifference.

"Deliberate indifference is not medical malpractice; the Eighth Amendment doesn't codify common law torts." Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008); *see also* Majors v. Ridley-Turner, 277 F. Supp. 2d 916, 919 (N.D. Ind. 2003) ("Even medical malpractice and incompetence do not state a claim of deliberate indifference."). Disagreement with medical personnel over what constitutes appropriate treatment is insufficient to establish deliberate indifference. Reed v. Indiana Dep't of Corrections, 30 Fed. Appx. 616, 618 (7th Cir. 2002) (*citing* Estelle v. Gamble, 429 U.S. 97, 107 (1976)). "A jury can 'infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" Duckworth v. Ahmad, 532 F.3d at 679 (*quoting* Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir.

2006)); *see also* <u>Collignon v. Milwaukee Co.</u>, 163 F.3d at 989 ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances.").

The court initially notes that the Estate's state law malpractice claims remain, so no discussion is appropriate as to whether the medical care provided by the defendants fell below the applicable standard of care under Indiana law. The CMS individual defendants monitored Mr. Rice's status, checked on him regularly, administered or tried to administer medication to him, gave him extra food and supplements, discussed his status with Dr. Rohrer, and followed Dr. Rohrer's orders. There is ample undisputed evidence establishing that the CMS defendants tried to care for Mr. Rice and address his medical issues. Nurse Jones testified that the nurses on occasion would visit Mr. Rice as often as six times a day. The CMS defendants also properly relied on Dr. Rohrer when determining what care to provide Mr. Rice. Although CMS cannot escape liability by contracting away its responsibilities, it can, within constitutional limits, rely on and act consistently with the experts with whom they contracted. *See, e.g.,* <u>Woodruff v. Isaacs</u>, No. 3:05-CV-607, 2007 WL 294250, at *3 (N.D. Ind. Jan. 29, 2007) ("Even if Nurse Harper told Mr. Woodruff, as he alleges, that they did not need to do anything for his hernia, it states no Eighth Amendment claim because she referred him to the jail doctors who made the determination what treatment

to prescribe and whether his hernia required surgery or other treatment."). CMS nurses were entitled to rely on the expert judgment of Oaklawn, Dr. Ceniceros, and Dr. Rohrer as to the most appropriate mental health care and treatment for Mr. Rice.

The Estate contends Nurse Lambright was deliberately indifferent because she was on staff the night of Mr. Rice's death and never came to check on him when the inmates began shouting and kicking their cell doors. As already indicated, there is no evidence that the pounding on the cells included any warning that Mr. Rice was vomiting or in extremis and needed medical attention. Nor is there evidence that Nurse Lambright was aware or should have been aware that Mr. Rice might attempt to drink excessive amounts of water. Nurse Lambright can't be found to have been deliberately indifferent for not checking on Mr. Rice during the night of his death.

The Estate also contends the defendants were deliberately indifferent for not ensuring that Mr. Rice ate his meals and for allowing him to become malnourished and stay malnourished. If a "prisoner is insane, and his insanity causes him to refuse food; the prison is constitutionally obligated to treat his mental illness, if necessary by force-feeding him." Freeman v. Berge, 441 F.3d 543, 546 (7th Cir. 2006). The medical staff couldn't sit by and allow Mr. Rice to "starve himself to death, or even starve himself to the point at which he seriously impairs his health." Id. The medical defendants, however, monitored Mr. Rice's weight and tried to get him to eat. Dr. Rohrer had him admitted to Goshen

Hospital because of his concern about Mr. Rice's continued weight loss and mental condition. Dr. Mathew determined that Mr. Rice was medically stable and that forced feeding wasn't necessary. Upon Mr. Rice's return from Goshen Hospital on October 6, 2004, Nurse Jones instructed the jail canteen to provide Mr. Rice with high protein shakes twice a day. On October 24, Dr. Bierlein ordered that Mr. Rice be given extra food, and between October 31 and November 5, the nurses provided Mr. Rice with Carnation Instant Breakfast. Soon after, Mr. Rice began receiving a high-caloric diet and extra food through Canteen Services. Nurse Makousky testified that the nurses took Mr. Rice extra snacks and encouraged him to eat. Although the evidence suggests that Mr. Rice was moderate to severely malnourished at the time of his death, he regularly ate a portion of his food and didn't continue to lose weight after his return from Goshen Hospital.

Throughout Mr. Rice's incarceration, Dr. Rohrer visited him regularly, monitored his condition, prescribed him psychotropic medication, and had him committed to inpatient facilities on three occasions. Although Dr. Rohrer only saw Mr. Rice once after Mr. Rice returned to the jail from Goshen Hospital, he instructed the nurses to ask Mr. Rice weekly if he would resume his medication. Dr. Rohrer was also informed that Mr. Rice had been eating at least some of his food. The Estate says Dr. Rohrer should have done more for Mr. Rice upon his October 6 return from the hospital, but there is no evidence that any particular psychiatric care, other than forced medication, would have improved his medical condition.

A patient has a statutory right to refuse treatment. The Indiana Supreme Court has stated:

> [T]he court must determine that there has been an evaluation of each and every other form of treatment and that each and every alternative form of treatment has been specifically rejected. It must be plain that there exists no less restrictive alternative treatment and that the treatment selected is reasonable and is the one which restricts the patient's liberty the least degree possible. Inherent in this standard is the possibility that, due to the patient's objection, there may be no reasonable treatment available. This possibility is acceptable. The duty to provide treatment does not extend beyond reasonable methods.

In re Mental Commitment of M.P., 510 N.E.2d 645, 647-648 (Ind. 1987). Before administering forced medication, a physician "must demonstrate by clear and convincing evidence that . . . the probable benefits from the proposed treatment outweigh the risk of harm to, and personal concerns of, the patient." 510 N.E.2d at 647. The Supreme Court has stated that an inmate "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment," and that "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness." Washington v. Harper, 494 U.S. 210, 221-222, 229 (1990). Before a physician can force medicate, "procedural protections are necessary to ensure that the decision to medicate an inmate against his will is neither arbitrary nor erroneous." Id. at 228.

Where a patient's conflicting rights intersect — the right to refuse treatment versus the right to treatment to prevent injury to self — is a matter that implicates medical judgment. *See* <u>Estate of Cole v. Fromm</u>, 94 F.3d 254, 262 (7th Cir. 1996) ("[The inmate] had a right to be free from restraint, but this right was not absolute; it ended at the point at which his freedom of restraint posed the substantial risk that he would seriously injure or kill himself."). In <u>Sanville v. McCaughtry</u>, 266 F.3d 724 (7th Cir. 2001), a mentally ill inmate refused medication and ultimately committed suicide. One of the physician-defendants was criticized for having deferred to the inmate's decision to refuse psychiatric medications. <u>Id.</u> at 734. The court stated that the physician had to balance the inmate's competing right to treatment and his right to refuse it and that the physician "seemingly determined that [the inmate's] desire to be free from medication outweighed his right (or need) to receive psychotropic drugs for his mental illness." <u>Id.</u> at 735. The court reasoned:

> That a doctor would defer to the discretion of a mentally ill inmate may be troubling to a layperson, particularly when the doctor appeared to recognize that Matt needed to be medicated. And we would hope that additional precautions would have been taken if they were thought to be necessary. Plaintiff has not provided us with any reason, however, to find that Dr. Fleck's choices were not made in the exercise of his professional judgment. While Mrs. Sanville would have preferred the doctor to be less deferential to Matt's requests and more forceful in pursuing the option of medicating him, we agree with the district court that Dr. Fleck's actions and medical notes counsel against a finding of deliberate indifference.

<u>Id.</u> at 736. It was a matter within Dr. Rohrer's medical judgment whether or not to force medicate Mr. Rice.

This isn't a case where medical professionals simply ignored Mr. Rice's condition. The record shows that attempts were made to get Mr. Rice to take his medication, but he mostly refused. While it's true that the defendants could have done more to monitor and treat Mr. Rice, their conduct doesn't rise to the level of deliberate indifference. *See* <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). In <u>Estelle v. Gamble</u>, the seminal case addressing an inmate's constitutional right to medical care, no inference of indifference was permissible when medical personnel had seen the inmate seventeen times in a three-month stretch. <u>Id.</u> The frequency of medical care provided to Mr. Rice exceeded that provided to inmate Gamble by orders of magnitude.

Further, it wasn't reasonably foreseeable that Mr. Rice would suffer from cardiac arrhythmia due to hyponatremia arising from Mr. Rice's ingestion of excessive amounts of water over a short period of time. The defendants were aware of the serious medical needs posed by schizophrenia (though not every occasional result of schizophrenia) and starvation, and they took measures to address those needs. While the plaintiff's expert reports might shed light on further measures the defendants could have or maybe should have taken to prevent Mr. Rice's death, they aren't sufficient to allow a jury to infer indifference. *See* <u>Johnson v.</u>

<u>Doughty</u>, 433 F.3d at 1012-1013. The evidence in the summary judgment record would not allow a finding that the medical defendants' treatment was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." <u>Duckworth v. Ahmad</u>, 532 F.3d at 680.[10]

## V. COUNT III - STATE LAW CLAIMS

The defendants contend that this case isn't in federal court on diversity jurisdiction, so the court should therefore relinquish supplemental jurisdiction over the remaining state law claims. The Estate indicated in a recent filing that the "[d]efendants are incorrect and mistaken in their belief that [p]laintiffs did not plead . . . a claim of diversity jurisdiction . . ." *See* Document # 323. In its First Amended Complaint, the Estate alleges:

> 1. This action arises under the United States Constitution, particularly under the provisions of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution under the laws of the United States, particularly under the Civil Rights Act, Title 42 of the United States Code § 1983 and 1988.

> 2. This Court has jurisdiction to this action under the provisions of Title 28 of the United States Code § 1331 and §1343 and pendent jurisdiction over the state claims which arise out of the nucleus of operative facts common to Plaintiffs' federal claims. . . .
> . . . .

---

[10] The Estate also provides evidence that Mr. Rice had bed sores while at the jail, but there is a lack of evidence establishing the extent of the bedsores or that the medical defendants failed to treat those sores.

4. The amount in controversy exceeds Seventy Five Thousand and no/100 ($75,000.00) exclusive of costs, interest, and attorney fees.

Nowhere in the Estate's amended complaint does it mention § 1332, diversity, or citizenship. Although, the Estate has provided the residency of the defendants, residency isn't citizenship, Held v. Held, 137 F.3d 998, 1000 (7th Cir. 1998), and jurisdiction depends on citizenship of each party at the time the case begins. Denlinger v. Brennan, 87 F.3d 214, 216 (7th Cir. 1996). Indeed, the defendants contend that there is no diversity because Mr. Rice was a citizen of Michigan and so was Margaret Miller.

The court agrees with the defendants that diversity jurisdiction wasn't properly alleged, so the only basis of federal jurisdiction over the Estate's state law claims is federal supplemental jurisdiction, 28 U.S.C. § 1367. Section 1367 "allows federal courts to decide state-law claims that are outside the federal diversity jurisdiction if they are so closely related to the plaintiff's federal-law claims as to be in effect part of the same case." Williams Electronics Games, Inc. v. Garrity, 479 F.3d 904, 906 (7th Cir. 2007). A district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

A district court should "consider and weigh the factors of judicial economy, convenience, fairness, and comity in deciding whether to exercise jurisdiction" over supplemental state law claims. Wright v. Associated Ins. Cos., Inc., 29 F.3d 1244, 1251 (7th Cir.1994). When all federal claims are dismissed before trial, the

district court generally should relinquish jurisdiction over supplemental state law claims rather than resolving them on the merits. Id. "This rule however, is subject to three recognized exceptions: when the refilling of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim is to be decided." Williams v. Rodriguez, 509 F.3d 392, 404 (7th Cir. 2007).

This court has dismissed all the Estate's federal claims. These claims involved a different legal theory than the Estate's state law claims of negligence, and no trial date is set in this court. After weighing the relevant factors, the court declines to exercise supplemental jurisdiction over the Estate's remaining state law claims, noting that the Estate is free to file these claims in state court. Section 1367(d) explicitly tolls the statute of limitations for thirty days after dismissal of a supplemental claim to allow the plaintiff to refile the claim in state court without being time-barred. 28 U.S.C. § 1367(d); *see also* IND. CODE § 34-11-8-1. Accordingly, this court dismisses the Estate's state law claims as to all defendants without prejudice so that it may pursue them, if it chooses, in state court.


VI. CONCLUSION

The court DENIES the Estate's motion to strike CMS defendants' and Elkhart County defendants' memoranda and statement of facts in support of their summary judgment motions [Doc. Nos. 251, 252, and 253]; GRANTS the

defendants' motions to strike inmate affidavits of Montie George, John Neace, and Michael Brown [Doc. Nos. 282, 285, 286, and 291], but not CMS's motion to strike inmate Joshua Shaw's affidavit [Doc. No. 286]; GRANTS the Estate's motion to strike Dr. John Pless's affidavit [Doc. No. 298]; GRANTS the defendants' motions for partial summary judgment [Doc. Nos. 189, 194, 196, 197, 211, and 246]; and DENIES as moot Doc. Nos. 267, 304, 308, and 318. The court DISMISSES without prejudice the Estate's state law claims.

SO ORDERED.

ENTERED:   June 17, 2009

  /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court